**Jerry STRUNK, An Incompetent by and through Morris E. Burton His Guardian Ad Litem, Appellant,**

v.

**Ava STRUNK, Committee for Jerry Strunk, Incompetent, et al., Appellees.**

Court of Appeals of Kentucky.

Sept. 26, 1969.

Morris E. Burton, Frankfort, for appellant.

Katherine Parry Davenport, Kentucky Department of Mental Health, Frankfort, amicus curiae.

Joe C. Savage, Lexington, for appellees.

OSBORNE, Judge.

The specific question involved upon this appeal is: Does a court of equity have the power to permit a kidney to be removed from an incompetent ward of the state upon petition of his committee, who is also his mother, for the purpose of being transplanted into the body of his brother, who is dying of a fatal kidney disease? We are of the opinion it does.

The facts of the case are as follows: Arthur L. Strunk, 54 years of age, and Ava Strunk, 52 years of age, of Williamstown, Kentucky, are the parents of two sons. Tommy Strunk is 28 years of age, married, an employee of the Penn State Railroad and a part-time student at the University of Cincinnati. Tommy is now suffering from chronic glomerulus nephritis, a fatal kidney disease. He is now being kept alive by frequent treatment on an artificial kidney, a procedure which cannot be continued much longer.

Jerry Strunk is 27 years of age, incompetent, and through proper legal proceedings has been committed to the Frankfort State Hospital and School, which is a state institution maintained for the feebleminded. He has an I.Q. of approximately 35, which corresponds with the mental age of approximately six years. He is further handicapped by a speech defect, which makes it difficult for him to communicate with persons who are not well acquainted with him. When it was determined that Tommy, in order to survive, would have to have a kidney the doctors considered the possibility of using a kidney from a cadaver if and when one became available or one from a live donor if this could be made available. The entire family, his mother, father and a number of collateral relatives were tested. Because of incompatibility of blood type or tissue none were medically acceptable as live donors. As a last resort, Jerry was tested and found to be highly acceptable. This immediately presented the legal problem as to what, if anything, could be done by the family, especially the mother and the father to procure a transplant from Jerry to Tommy. The mother as a committee petitioned the county court for authority to proceed with the operation. The court found that the operation was necessary, that under the peculiar circumstances of this case it would not only be beneficial to Tommy but also beneficial to Jerry because Jerry was greatly dependent upon Tommy, emotionally and psychologically, and that his well-being would be jeopardized more severely by the loss of his brother than by the removal of a kidney.

Appeal was taken to the Franklin Circuit Court where the chancellor reviewed the record, examined the testimony of the witnesses and adopted the findings of the county court.

A psychiatrist, in attendance to Jerry, who testified in the case, stated in his opinion the death of Tommy under these circumstances would have "an extremely traumatic effect upon him" (Jerry).

The Department of Mental Health of this Commonwealth has entered the case as amicus curiae and on the basis of its evaluation of the seriousness of the operation as opposed to the traumatic effect upon Jerry as a result of the loss of Tommy, recommended to the court that Jerry be permitted to undergo the surgery. Its recommendations are as follows:

"It is difficult for the mental defective to establish a firm sense of identity with another person and the acquisition of this necessary identity is dependent upon a person whom one can conveniently accept as a model and who at the same time is sufficiently flexible to allow the defective to detach himself with reassurances of continuity. His need to be social is not so much the necessity of a formal and mechanical contact with other human beings as it is the necessity of a close intimacy with other men, the desirability of a real community of feeling, an urgent need for a unity of understanding. Purely mechanical and formal contact with other men does not offer any treatment for the behavior of a mental defective; only those who are able to communicate intimately are of value to hospital treatment in these cases. And this generally is a member of the family.

"In view of this knowledge, we now have particular interest in this case. Jerry Strunk, a mental defective, has emotions and reactions on a scale comparable to that of normal person. He identifies with his brother Tom; Tom is his model, his tie with his family. Tom's life is vital to the continuity of Jerry's improvement at Frankfort State Hospital and School. The testimony of the hospital representative reflected the importance to Jerry of his visits with his family and the constant inquiries Jerry made about Tom's coming to see him. Jerry is aware he plays a role in the relief of this tension. We the Department of Mental Health must take all possible steps to prevent the occurrence

of any guilt feelings Jerry would have if Tom were to die.

"The necessity of Tom's life to Jerry's treatment and eventual rehabilitation is clearer in view of the fact that Tom is his only living sibling and at the death of their parents, now in their fifties, Jerry will have no concerned, intimate communication so necessary to his stability and optimal functioning.

"The evidence shows that at the present level of medical knowledge, it is quite remote that Tom would be able to survive several cadaver transplants. Tom has a much better chance of survival if the kidney transplant from Jerry takes place."

Upon this appeal we are faced with the fact that all members of the immediate family have recommended the transplant. The Department of Mental Health has likewise made its recommendation. The county court has given its approval. The circuit court has found that it would be to the best interest of the ward of the state that the procedure be carried out. Throughout the legal proceedings, Jerry has been represented by a guardian ad litem, who has continually questioned the power of the state to authorize the removal of an organ from the body of an incompetent who is a ward of the state. We are fully cognizant of the fact that the question before us is unique. Insofar as we have been able to learn, no similar set of facts has come before the highest court of any of the states of this nation or the federal courts. The English courts have apparently taken a broad view of the inherent power of the equity courts with regard to incompetents. Ex parte Whitebread (1816), 2 Mer. 99; 35 E.R. 878, L.C. holds that courts of equity have the inherent power to make provisions for a needy brother out of the estate of an incompetent. This was first followed in this country in New York, In the Matter of Willoughby, a Lunatic, 11 Paige 257 (NY 1844). The inherent rule in these cases is that the chancellor has the power to deal

with the estate of the incompetent in the same manner as the incompetent would if he had his faculties. This rule has been extended to cover not only matters of property but also to cover the personal affairs of the incompetent. 27 Am.Jur. 2, Equity, § 69, p. 592, as follows:

"It is a universal rule of equity that where a person is not equal to protecting himself in a particular case, the court will protect him. As part of the inherent power of equity, a court of equity has full and complete jurisdiction over the persons of those who labor under any legal disability and also over their property. While the general control over such persons has very generally been transferred by statute to probate courts, it does not follow, unless the equity court has been definitely shorn of power, that equity jurisdiction thereover may no longer be exercised. Where legal disability of the individual is shown, the jurisdiction of the court is plenary and potent to afford whatever relief may be necessary to protect his interests and preserve his estates. The court's action in such a case is not limited by any narrow bounds, but it is empowered to stretch forth its arm in whatever direction its aid and protection may be needed. While this is indeed a special exercise of equity jurisdiction, it is beyond question that by virtue thereof the court may pass upon purely personal rights.

"With regard to the origin and source of equity jurisdiction, the doctrine now commonly maintained is that it represents a delegation to the chancellor of the Crown's right as parens patriae to interfere in particular cases for the benefit of such persons as are incapable of protecting themselves, that such jurisdiction belonged to the High Court of Chancery and was exercised by it from its first establishment, and that the jurisdiction exists in the United States by inheritance from the English court, and not because equitable rights or titles are involved."

The right to act for the incompetent in all cases has become recognized in this country as the doctrine of substituted judgment and is broad enough not only to cover property but also to cover all matters touching on the well-being of the ward. The doctrine has been recognized in American courts since 1844.

"The 'doctrine of substituted judgment,' which apparently found its first expression in the leading English case of Ex parte Whitebread (1816) 2 Meriv 99, 35 Eng Reprint 878 (Ch), supra § 3(a), was amplified in Re Earl of Carysfort (1840) Craig & Ph 76, 41 Eng Reprint 418, where the principle was made to apply to one who was not next of kin of the lunatic but a servant of his who was obliged to retire from his service by reason of age and infirmity. The Lord Chancellor permitted the allowance of an annuity out of the income of the estate of the lunatic earl as a retiring pension to the latter's aged personal servant, although no supporting evidence could be found, the court being 'satisfied that the Earl of Carysfort would have approved if he had been capable of acting himself.'" Annot., 24 A.L.R.3d 863 (1969).

In this state we have delegated substantial powers to committees of persons of unsound minds, see KRS 387.230 and KRS 387.060, and to county courts in their supervision. However, as pointed out in American Jurisprudence, these statutes were not intended to divest the equity courts of their inherent common law powers. These powers we have continued to exercise in spite of the jurisdiction granted to the county courts. See Pearl v. M'Dowell (1830) 26 Ky. (3JJ Marsh) 658; Dalton v. Dalton (1916) 172 Ky. 585, 189 S.W. 902; Casebier v. Casebier (1921) 193 Ky. 490, 236 S.W. 966; Polivick v. Polivick (1935) 259 Ky. 653, 83 S.W.2d 8; Arms' Committee v. Arms (1935) 260 Ky. 634, 86 S.W.2d 542; Thomasson v. Thomasson (1949) 310 Ky. 234, 219 S.W. 2d 957.

The medical practice of transferring tissue from one part of the human body to another (autografting) and from one human being to another (homografting) is rapidly becoming a common clinical practice. In many cases the transplants take as well where the tissue is dead as when it is alive. This has made practicable the establishment of tissue banks where such material can be stored for future use. Vascularized grafts of lungs, kidneys and hearts are becoming increasingly common. These grafts must be of functioning, living cells with blood vessels remaining anatomically intact. The chance of success in the transfer of these organs is greatly increased when the donor and the donee are genetically related. It is recognized by all legal and medical authorities that several legal problems can arise as a result of the operative techniques of the transplant procedure. Curran, A Problem of Consent: Kidney Transplantation in Minors, 34 N.Y. University Law Review 891, (1959).

The renal transplant is becoming the most common of the organ transplants. This is because the normal body has two functioning kidneys, one of which it can reasonably do without, thereby making it possible for one person to donate a kidney to another. Testimony in this record shows that there have been over 2500 kidney transplants performed in the United States up to this date. The process can be effected under present techniques with minimal danger to both the donor and the donee. Doctors Hamburger and Crosneir describe the risk to the donor as follows:

"This discussion is limited to renal transplantation, since it is inconceivable that any vital organ other than the kidney might ever be removed from a healthy living donor for transplantation purposes. The immediate operative risk of unilateral nephrectomy in a healthy subject has been calculated as approximately 0.05 per cent. The long-term risk is more difficult to estimate, since the various types of renal disease do not appear to be more frequent or more severe in

individuals with solitary kidneys than in normal subjects. On the other hand, the development of surgical problems, trauma, or neoplasms, with the possible necessity of nephrectomy, do increase the long-term risks in living donors; the long-term risk, on this basis, has been estimated at 0.07 per cent (Hamburger et al., 1964). These data must, however, be considered in the light of statistical life expectancy which, in a healthy 35 year old adult, goes from 99.3 per cent to 99.1 per cent during the next five succeeding years; this is an increase in risk equal to that incurred by driving a car for 16 miles every working day (Merrill, 1964). The risks incurred by the donor are therefore very limited, but they are a reality, even if, until now, there have been no reports of complications endangering the life of a donor anywhere in the world. Unfortunately, there is no doubt that, as the number of renal transplants increases, such an incident will inevitably be recorded." [1]

Review of our case law leads us to believe that the power given to a committee under KRS 387.230 would not extend so far as to allow a committee to subject his ward to the serious surgical techniques here under consideration unless the life of his ward be in jeopardy. Nor do we believe the powers delegated to the county court by virtue of the above statutes would reach so far as to permit the procedure which we are dealing with here.

We are of the opinion that a chancery court does have sufficient inherent power to authorize the operation. The circuit court having found that the operative procedures in this instance are to the best interest of Jerry Strunk and this finding having been based upon substantial evidence, we are of the opinion the judgment should be affirmed. We do not deem it significant that this case reached the circuit court by way of appeal as opposed to a direct proceeding in that court.

Judgment affirmed.

HILL, C. J., MILLIKEN and REED, JJ., concur.

NEIKIRK, PALMORE and STEINFELD, JJ., dissent.

STEINFELD, Judge (dissenting).

Apparently because of my indelible recollection of a government which, to the everlasting shame of its citizens, embarked on a program of genocide and experimentation with human bodies I have been more troubled in reaching a decision in this case than in any other. My sympathies and emotions are torn between a compassion to aid an ailing young man and a duty to fully protect unfortunate members of society.

The opinion of the majority is predicated upon the authority of an equity court to speak for one who cannot speak for himself. However, it is my opinion that in considering such right in this instance we must first look to the power and authority vested in the committee, the appellee herein. KRS 387.060 and KRS 387.230 do nothing more than give the committee the power to take custody of the incompetent and the possession, care and management of his property. Courts have restricted the activities of the committee to that which is for the best interest of the incompetent. Harding's Adm'r v. Harding's Ex'r., 140 Ky. 277, 130 S.W. 1098 (1910); Miller v. Keown, 176 Ky. 117, 195 S.W. 430 (1912) and 3 A.L.R. 3d 18. The authority and duty have been to protect and maintain the ward, to secure that to which he is entitled and preserve that which he has. Ramsey's Ex'r v. Ramsey, 243 Ky. 202, 47 S.W.2d 1059 (1932); Aaronson v. State of New York, 34 Misc.2d

---

1. Hamburger and Crosneir, Moral and Ethical Problems in Transplantation, in HUMAN TRANSPLANTATION 37, (Rapaport and Dausset ed. 1968).

827, 229 N.Y.S.2d 550, 557 (1962) and Young v. State, 32 Misc.2d 965, 225 N.Y.S.2d 549 (1962). The wishes of the members of the family or the desires of the guardian to be helpful to the apparent objects of the ward's bounty have not been a criterion. "A curator or guardian cannot dispose of his ward's property by donation, even though authorized to do so by the court on advice of a family meeting, unless a gift by the guardian is authorized by statute." 44 C.J.S. Insane Persons § 81, p. 191.

Two Kentucky cases decided many years ago reveal judicial policy. In W. T. Sistrunk & Co. v. Navarra's Committee, 268 Ky. 753, 105 S.W.2d 1039 (1937), this court held that a committee was without right to continue a business which the incompetent had operated prior to his having been declared a person of unsound mind. More analogous is Baker v. Thomas, 272 Ky. 605, 114 S.W.2d 1113 (1938), in which a man and woman had lived together out of wedlock. Two children were born to them. After the man was adjudged incompetent, his committee, acting for him, together with his paramour, instituted proceedings to adopt the two children. In rejecting the application and refusing to speak for the incompetent the opinion stated:

> "The statute does not contemplate that the committee of a lunatic may exercise any other power than to have the possession, care, and management of the lunatic's or incompetent's estate. No authority is given by any statute to which our attention has been called, or that we have been by careful research able to locate, giving the committee of a lunatic or an incompetent authority to petition any court for the adoption of a person or persons as heirs capable of the inheritance of his or her estate."

The same result was reached in In re Bourgeois, 144 La. 501, 80 So. 673 (1919), in which the husband of an incompetent wife sought to change the beneficiary of her insurance policy so that her children would receive the proceeds. Grady v. Dashiell, 24 Wash.2d 272, 163 P.2d 922 (1945), stands for the proposition that a loan to the ward's adult insolvent son made at a time when it was thought that the ward was incurably insane constituted an improper depletion of the ward's estate.

The majority opinion is predicated upon the finding of the circuit court that there will be psychological benefits to the ward but points out that the incompetent has the mentality of a six-year-old child. It is common knowledge beyond dispute that the loss of a close relative or a friend to a six-year-old child is not of major impact. Opinions concerning psychological trauma are at best most nebulous. Furthermore, there are no guarantees that the transplant will become a surgical success, it being well known that body rejection of transplanted organs is frequent. The life of the incompetent is not in danger, but the surgical procedure advocated creates some peril.

It is written in Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), that "Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full and legal discretion when they can make that choice for themselves." The ability to fully understand and consent is a prerequisite to the donation of a part of the human body. Cf. Bonner v. Moran, 75 U.S.App.D.C. 156, 126 F.2d 121, 139 A.L.R. 1366 (1941), in which a fifteen-year-old infant's consent to removal of a skin patch for the benefit of another was held legally ineffective.

Unquestionably the attitudes and attempts of the committee and members of the family of the two young men whose critical problems now confront us are commendable, natural and beyond reproach. However, they refer us to nothing indicating that they are privileged to authorize the removal of one of the kidneys of the incompetent for the purpose of donation, and they cite no statutory or other authority vesting such right in the courts. The proof shows that less compatible donors are available and

that the kidney of a cadaver could be used, although the odds of operational success are not as great in such case as they would be with the fully compatible donor brother.

I am unwilling to hold that the gates should be open to permit the removal of an organ from an incompetent for transplant, at least until such time as it is conclusively demonstrated that it will be of significant benefit to the incompetent. The evidence here does not rise to that pinnacle. To hold that committees, guardians or courts have such awesome power even in the persuasive case before us, could establish legal precedent, the dire result of which we cannot fathom. Regretfully I must say no.

NEIKIRK and PALMORE, JJ., join with me in this dissent.