PETER HART ET AL. *v.* ROBERT S. BROWN ET AL.

SUPERIOR COURT     FAIRFIELD COUNTY     FILE No. 145672
AT BRIDGEPORT

Memorandum filed March 21, 1972

*Gerard S. Spiegel,* of Trumbull, for all plaintiffs.

*Wiggin & Dana,* of New Haven, for the defendants.

TESTO, J. This matter is before this court by way of an action for a declaratory judgment. General Statutes § 52-29; Practice Book § 307.

The plaintiffs are Peter Hart and Eleanor Hart, the parents and natural guardians of Katheleen A. Hart and Margaret H. Hart, minors, identical twins, age seven years and ten months. The minor twins

appear herein by court-appointed guardians ad litem: Attorney Thomas Dolan for the minor Margaret, and Mrs. Sylvia Chandler for the minor Katheleen. The defendants are practicing physicians licensed in this state and the Yale-New Haven Hospital, Inc., a duly organized Connecticut corporation located in the city and county of New Haven.

The plaintiff minor Katheleen A. Hart is presently a patient in the Yale-New Haven Hospital awaiting a kidney transplant. It is reasonably probable that if such procedure does not occur soon she will die. The defendant physicians have in the past performed successful kidney transplantation operations, and they are of the opinion that a successful transplantation operation can be performed on the plaintiff minors, Katheleen A. Hart as donee and Margaret H. Hart as donor.

The plaintiffs Peter Hart and Eleanor Hart, each of whom had originally offered a kidney, have requested as parents and natural guardians of the identical twins the transplantation operation of the kidney, but the defendant physicians are unwilling to perform this operation and the defendant hospital refuses the use of its facilities unless this court declares that the parents and/or guardians ad litem of the minors have the right to give their consent to the operation upon the minor twins.

The equity powers of a court must be cautiously and sparingly exercised and only in rare instances should they be exercised. The need must be urgent, the probabilities of success should be most favorable, and the duty must be clear. If it were otherwise, a court of equity, in a case such as this, might assume omnipotent powers; to do so is not the function of the court and must be avoided.

The inherent power of a court of equity to grant the relief sought herein has been decided previously

in our American courts. In earlier decisions, the English courts took a broader view of this power, with respect to incompetents. *Ex parte Whitbread,* 2 Mer. 99, 35 Eng. Rep. 878 (Ch. 1816). That case held that a court of equity has the power to make provisions for a needy brother from the estate of an incompetent. This inherent rule was followed in this country in New York; *Re Willoughby,* 11 Paige 257 (N.Y. Ch. 1844); where the court stated that a chancellor has the power to deal with the estate of an incompetent in the same manner as the incompetent if he had his faculties. This rule has been extended to cover not only property matters but also the personal affairs of an incompetent. 27 Am. Jur. 2d 592, Equity, § 69. "[A] court of equity has full and complete jurisdiction over the persons of those who labor under any legal disability . . . . The court's action . . . is not limited by any narrow bounds, but it is empowered to stretch forth its arm in whatever direction its aid . . . may be needed. While this indeed is a special exercise of equity jurisdiction, it is beyond question that by virtue thereof the court may pass upon purely personal rights." Ibid. The right to act for an incompetent has been recognized as the "doctrine of substituted judgment" and is broad enough to cover all matters touching on the well-being of legally incapacitated persons. The doctrine has been recognized in American courts since 1844.

This court is not being asked to act where a person is legally incompetent. The matter, however, does involve two minors who do not have the legal capacity to consent. This situation was dealt with in three earlier unreported cases decided in our sister state of Massachusetts. The commonwealth of Massachusetts ruled that a court of equity does have the power to permit the natural parents of minor twins to give their consent to a procedure such as

is being contemplated by this court. *Masden* v. *Harrison*, No. 68651, Eq. Mass. Sup. Jud. Ct. (June 12, 1957); *Hushey* v. *Harrison*, No. 68666, Eq. Mass. Sup. Jud. Ct. (Aug. 30, 1957); *Foster* v. *Harrison*, No. 68674, Eq. Mass. Sup. Jud. Ct. (Nov. 20, 1957). Those cases involved minors of the ages of nineteen, fourteen and fourteen. In a similar case, *Strunk* v. *Strunk*, 445 S.W.2d 145 (Ky. 1969), a court of equity was confronted with whether or not it had the power to permit the natural parent of a twenty-seven-year-old mental incompetent with a mentality of a six-year-old to give her consent to a kidney transplantation operation. The Kentucky case dealt with a transplant from the mental incompetent to his twenty-eight-year-old brother. The court held that a court of equity does have such power, applying also the "doctrine of substituted judgment."

Therefore, this court is of the opinion that it has the power to act in this matter.

The facts of the case as testified to by competent medical witnesses are as follows: Katheleen Hart is a minor of the age of seven years and ten months and is suffering from a hemolytic uremic syndrome. This is a disorder of the kidneys with clots within the small blood vessels. This disease has no known etiology and is prevalent primarily in young children. The diagnosis was confirmed on November 29, 1971, after a kidney biopsy was performed. Hemodialysis treatments were commenced on December 8, 1971, along with other treatment to correct this disorder. On February 1, 1972, her kidney was biopsied for the second time because of the onset of a malignant type of blood pressure elevation, and this biopsy disclosed a new and more disastrous lesion—malignant hypertension—which could prove fatal. On February 17, 1972, a bilateral nephrectomy was performed, with removal of both kidneys to control the situation. As of that date, Katheleen

became a patient with fixed uremia with no potential kidney function and required dialysis treatments twice weekly. The prospect of survival is, because of her age, at best questionable. It was medically advised that she not continue this dialysis therapy but rather that a kidney transplantation take place.

The types of kidney transplantations discussed in this matter were a parental homograft—transfer of tissue from one human being to another—and an isograft, that is, a one-egg twin graft from one to another. The parental homograft always presents a serious problem of rejection by the donee. Because the human body rejects any foreign organs, the donee must be placed upon a program of immunosuppressive drugs to combat such rejection. An isograft transplantation, on the other hand, is not presented with the problem of rejection. A one-egg twin carries the same genetic material, and, because of this, rejection is not a factor in the success rate of the graft.

The chance of Katheleen's surviving dialysis therapy for a period of five years was estimated at fifty-fifty, with the possibility of many other complications setting in. The ultimate purpose of dialysis treatment in a child this age is to keep the patient alive until a kidney transplant is found. Because of the many complications involved in a transplantation procedure other than with the minor identical twin as donor, it has been medically advised that an isograft transplantation be recommended.

Since 1966, it is reported in the Ninth Report of the Human Renal Transplant Registry, twelve twin grafts have been performed. All twelve have been successful, as reported by the Registry, at one- and two-year follow-ups. In the identical-twin donations since 1966, grafts are functioning at 100 percent.

Before 1966, because of technical matters, the survival rate was about 90 percent. Of all isografts followed since 1966, all are successful. In this type of a graft there is substantially a 100 percent chance that the twins will live out a normal life span—emotionally and physically.

If a parent donates the kidney, the statistics show less success. The average percent of success in that type of transplant has been 70 percent at one year and 65 percent or so over a two-year period. The falloff thereafter runs another 5 to 10 or more percent per year. The long-range survival of a parent transplant runs around 50 to 55 percent over a period of five years and appears to fall off to about 37 percent over a period of seven years.

The side effects of the immunosuppressive drugs in a parental homograft are numerous and include the possibility of bone marrow toxicity, liver damage, and a syndrome called Cushing syndrome—a roundish face, a "buffalo hump" on the back of the neck, and growth retardation. Some less common side effects are a demineralization of the bone mass which will result in the collapsing of bones of the spine; aseptic necrosis of the femoral head of the hip, making a person unable to walk; peptic ulcer disease with bleeding; hairiness; sexual immaturity; and cataracts of the eyes. It has also been reported that two suicides have occurred because of the psychological effect upon young girls resulting from immunosuppressive drugs. An overall percentage of around 70 to 77 percent would be expected to survive two years from a parental graft. It is also possible that 40 to 50 percent of the patients might still be surviving at near ten years with a parental graft.

Of 3000 recorded kidney operations of live donors, there is reported only one death of a donor, and even this death may have been from causes un-

▉▉▉▉▉▉▉

related to the procedure. The short-range risk to a donor is negligible. The operating surgeon testified that the surgical risk is no more than the risk of the anesthesia. The operative procedure would last about two and one-half hours. There would be some minor postoperative pain but no more than in any other surgical procedure. The donor would be hospitalized for about eight days and would be able to resume normal activities in thirty days. Assuming an uneventful recovery, the donor would thereafter be restricted only from violent contact sports. She would be able to engage in all of the normal life activities of an active young girl. Medical testimony indicated that the risk to the donor is such that life insurance actuaries do not rate such individuals higher than those with two kidneys. The only real risk would be trauma to the one remaining kidney, but testimony indicated that such trauma is extremely rare in civilian life.

The tests to be performed on the donor are an intravenous pyelogram and an aortagram. The former would permit the examiner to visualize the structure and anatomy of the kidneys, while the latter would outline the blood vessels that supply the blood to the kidneys. Both tests involve a single needle puncture—one into a vein and one into an artery. There might be a skin graft test performed if necessary to confirm the fact that donor and donee are identical twins. The operation would not be performed if the medical team was not fully satisfied that the donor and the donee are identical twins.

A psychiatrist who examined the donor gave testimony that the donor has a strong identification with her twin sister. He also testified that if the expected successful results are achieved they would be of immense benefit to the donor in that the donor would be better off in a family that was happy than in a

family that was distressed and in that it would be a very great loss to the donor if the donee were to die from her illness.

The donor has been informed of the operation and insofar as she may be capable of understanding she desires to donate her kidney so that her sister may return to her. A clergyman was also a witness and his testimony was that the decision by the parents of the donor and donee was morally and ethically sound. The court-appointed guardian ad litem for the donor gave testimony that he conferred with the parents, the physicians, the donor, and other men in the religious profession, and he has consented to the performance of the operation.

The medical testimony given at this hearing clearly indicates that scientifically this type of procedure is a "perfect" transplant.

The court has weighed the testimony of the clergyman who stated that the natural parents are making a morally sound decision. Also, the testimony of the court-appointed guardians ad litem was that they are giving their consent to the procedure. The psychiatric testimony is of limited value only because of the ages of the minors. The testimony of the natural parents was reviewed by this court, and it is apparent that they came to their decision only after many hours of agonizing consideration.

One of the legal problems in this matter presents a balancing of the rights of the natural parents and the rights of minor children—more directly, the rights of the donor child. Because of the unusual circumstances of this case and the fact of great medical progress in this field, it would appear that the natural parents would be able to substitute their consent for that of their minor children after a close, independent and objective investigation of their motivation and reasoning. This has been accomplished

in this matter by the participation of a clergyman, the defendant physicians, an attorney guardian ad litem for the donor, the guardian ad litem for the donee, and, indeed, this court itself.

A further question before this court is whether it should abandon the donee to a brief medically complicated life and eventual death or permit the natural parents to take some action based on reason and medical probability in order to keep both children alive. The court will choose the latter course, being of the opinion that the kidney transplant procedure contemplated herein—an isograft—has progressed at this time to the point of being a medically proven fact of life. Testimony was offered that this type of procedure is not clinical experimentation but rather medically accepted therapy.

There is authority in our American jurisdiction that nontherapeutic operations can be legally permitted on a minor as long as the parents or other guardians consent to the procedure. *Bonner* v. *Moran,* 126 F.2d 121 (1941). That case involved skin grafting from a fifteen-year-old boy to his cousin, who was severely burned. The year of the case was 1941, when such skin homografting—transferring tissue from one human being to another—was relatively novel. "[H]ere we have a case of a surgical operation not for the benefit of the person operated on but for another, and also so involved in its technique as to require a mature mind to understand precisely what the donor was offering to give." Id., 123. The court held that the consent of the parent was necessary.

In *Strunk* v. *Strunk,* 445 S.W.2d 145 (Ky. 1969), the adult donor was a legal incompetent. The court in the commonwealth of Kentucky authorized the parent to give her consent. The incompetent had the mental capacity of a six-year-old. The court further

held that the saving of the life of the incompetent's brother would be of benefit to the donor. In the instant case, it has been stated that the donor would enjoy a better future life if her ailing twin sister were kept alive. The difference between the cases is subtle. The donor here is almost eight years old. In the *Strunk* case, the donor was an adult with the mentality of a six-year-old. The risks to the donee in the *Strunk* case were more than what are presented here, the procedure there being a related homograft as compared to an isograft in this case, as discussed earlier in this opion. The accomplished results in that matter and in this matter are identical.

Thus, also, in the Massachusetts cases discussed above, where the doctrine of "grave emotional impact" to the donors was first used, the courts of that state permitted the procedures.

This court is confronted with a combination of the *Strunk* case and the Massachusetts cases in that the procedures in the latter involved minor identical twins and in the former a legally incompetent adult with the mental capacity of an infant. In the case at bar we have an identical twin donor almost eight years old. Justice was accomplished in all of the aforementioned cases. Justice will be accomplished in this case.

This court can and will make a determination of this matter, using the doctrines of law as stated in the *Strunk* case, in the *Bonner* case, and in the Massachusetts cases.

The court understands that the operation on the donee is a necessity for her continued life; that there are negligible risks involved to both donor and donee; that to subject the donee to a parental homograft may be cruel and inhuman because of the possible side effects of the immunosuppressive

drugs; that the prognosis for good health and long life to both children is excellent; that there is no known opposition to having the operations performed; that it will be most beneficial to the donee; and that it will be of some benefit to the donor. To prohibit the natural parents and the guardians ad litem of the minor children the right to give their consent under these circumstances, where there is supervision by this court and other persons in examining their judgment, would be most unjust, inequitable and injudicious. Therefore, natural parents of a minor should have the right to give their consent to an isograft kidney transplantation procedure when their motivation and reasoning are favorably reviewed by a community representation which includes a court of equity.

It is the judgment of this court that Eleanor Hart and Peter Hart have the right, under the particular facts and circumstances of this matter, to give their consent to the operations on both minor children and to give their consent to the defendant physicians to conduct the further medical tests that the defendants deem necessary prior to the performing of the operations, provided the defendant physicians medically establish the children to be identical twins and a report of their findings is filed with this court.

Judgment accordingly.