Richard RUBY, Rebecca Ruby, Donald Diamond, Denise Diamond, and Priscilla Pearl *

v.

Robert U. MASSEY, M. D., Executive Director, University of Connecticut Health Center, et al.

Civ. No. H–76–315.

United States District Court, D. Connecticut.

May 16, 1978.

_____

* The names of the plaintiffs are fictitious, but the parties are real.

362

Judith M. Mears, New Haven, Conn., for plaintiffs.

James A. Wade, Robinson, Robinson & Cole, Hartford, Conn., for Ruby.

Richard Reynolds, Day, Berry & Howard, Hartford, Conn., for Pearl.

Brenda Eckert, Shipman & Goodwin, Hartford, Conn., for Diamond.

John F. McKenna, Asst. Atty. Gen., Hartford, Conn., John G. Hill, Jr., Asst. Atty. Gen., Storrs, Conn., for defendants.

## RULING ON MOTION FOR SUMMARY JUDGMENT

BLUMENFELD, District Judge.

The plaintiffs in this case are three sets of natural parents who challenge the refus-

al of the University of Connecticut Health Center to perform what the Center concedes to be "medically indicated" sterilizations upon their severely mentally retarded[1] and physically handicapped daughters.

## Statement of the Case

The complaint in this action seeks injunctive and declaratory relief pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201. Plaintiffs request an injunction ordering the defendant University of Connecticut Health Center and named physicians employed by the Center to "refrain from refusing" to perform surgical hysterectomies[2] on their three non-institutionalized mentally retarded children and a declaratory judgment that the defendants' failure to perform the hysterectomies is unconstitutional as a violation of their right to privacy, to equal protection of the laws, and to due process of law.

The three girls (Susan aged 12, Valerie aged 13, and Lynn aged 15) are severely mentally retarded and physically handicapped (blind-deaf). Susan and Valerie have no useful communication abilities; Lynn has only minimal ability to communicate.[3] Although at present the girls are residents of a special school during the week, and live with their parents on the weekends, custodial care is inevitable for each of them because of their grossly impaired mental functioning and physical handicaps.[4] The Diamonds have sought Valerie's admission to one of the two state institutions for the retarded since 1968. Priscilla Pearl has sought Lynn's admission since 1970. Neither girl is apt to be admitted to a state institution in the foreseeable future.[5]

Each of the girls shows signs of sexual development. Susan began to menstruate in July 1975. She suffers severe and painful cramping before and during her menstrual periods, as well as great psychological distress. Susan cannot care for her own hygienic needs during menstruation, and it is highly unlikely that she will ever be able to do so.[6] Neither Valerie nor Lynn has begun to menstruate yet, but it is equally unlikely that either girl will be able to care for her own hygienic needs during menstruation.

The girls are presumably capable of conceiving, but if they were to become pregnant, they would be subject to grave risks because they are incapable of communicating with a physician about their own physical condition—i. e., whether they have had fainting spells, whether they are in pain, whether they can feel the fetus move, whether they are in labor.[7] Moreover, it is most unlikely that any of the girls would ever be able to use, reliably or safely, any of the standard means of contraception.[8] They cannot communicate with a physician about pain they might be suffering from an IUD, from an infection or ectopic pregnancy, and they are unable to check themselves

---

1. There is a difference between mental retardation, which refers to significantly subaverage general intellectual functioning existing concurrently with defects in adaptive behavior manifested during the developmental period, *cf. North Carolina Ass'n for Retarded Children v. North Carolina*, 420 F.Supp. 451, 453 (M.D.N.C. 1976), and mental incompetency, which is the mental inability to comprehend the consequences of one's actions. *See* Conn.Gen.Stat. § 19–569g, note 14 *infra*.

2. The particular operation to be performed will rest in the discretion of the surgeon who performs the operation.

3. Stipulation, ¶¶ 7, 12, 19.

4. Stipulation, ¶¶ 8, 13, 20.

5. Stipulation, ¶¶ 14, 21.

6. Stipulation, ¶ 9.

7. As the deposition of Dr. Osborne, the defendants' agent, makes clear, the girls cannot reasonably be expected to cope with either pregnancy or childbirth. Either experience would expose them to very serious physical danger. The girls are, therefore, "persons by whom procreation would be inadvisable" in the words of Conn.Gen.Stat. § 19–569g, not only because they are "incapable of comprehending the consequences of [their] actions," but also because such procreation would seriously threaten their own health and well-being.

8. Stipulation, ¶¶ 10, 17, 24.

to see if an IUD has been expelled.[9] In terms of preventive health care, the girls cannot be examined internally or tested (for cervical cancer, venereal disease, vaginal infection) without being put under a general anesthetic each time, with all the dangers posed by that process.[10]

The plaintiffs have consulted with a number of physicians and social workers who have concluded that therapeutic uterectomies (sterilizations) are "medically indicated." The defendants' agent, Dr. Osborne, agrees that the sterilizations are "medically indicated." He is professionally qualified to perform the surgery and he is willing to do so.

■ The John Dempsey Hospital, where the surgery would be performed, is a constituent part of the University of Connecticut Health Center, and routinely provides medical care and treatment, including "medically indicated" surgery for children of normal intelligence and retarded children who live in Connecticut. For such surgery, the informed consent of the child's parent(s) is considered legally sufficient. In the instant case, the defendants have refused to put the girls under general anesthetic for purposes of internal examinations preparatory to sterilizations, and have refused to perform the sterilizations "on the grounds that there is no legislative authority authorizing parental consent for such operations in Connecticut." The defendants have stipulated[11] that their refusal "is based solely upon their legal counsel's judgment that the plaintiff parents' consent to have such surgery performed . . . is not now or may not be in the future legally sufficient to protect the Health Center against possible civil liability." This concern is apparently widespread among Connecticut hospitals, for the plaintiffs unsuccessfully sought to have the sterilizations performed at several other (private) hospitals in the state before bringing the instant action.[12]

Two factors are said to account for the hospitals' fear of civil liability. First, there is no statute which expressly empowers parents and/or guardians of retarded persons to give legally sufficient consent to such sterilizations;[13] and second, there is no Connecticut statute which expressly authorizes the sterilization of mentally incompetent persons in general (private) hospitals.

It will be helpful to distinguish between two discrete claims made by the parents: (1) that their right as parents to familial privacy entitles them to give legally sufficient consent to the sterilization of their daughters; and (2) that their daughters are entitled to the benefits of Conn.Gen.Stat. § 19–569g, which does provide for sterilization of inmates of certain state institutions. The statute, which is set forth in the margin,[14] allows the institutions' superintend-

9. Deposition at 9, 11, 12.

10. Deposition at 12.

11. Stipulation, ¶ 31.

12. Stipulation, ¶ 36.
   A doctor who performs surgery upon his patient without first obtaining informed consent may be held liable. *Winters v. Miller*, 446 F.2d 65 (2d Cir.), cert. denied, 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369 (1971); *see* W. Prosser, *The Law of Torts*, at 102–06; Fraser & Chaday, *Informed Consent in Malpractice Cases*, 6 Willamette L.J. 183 (1970).

13. Nor, it should be noted, is there any Connecticut statute which prohibits the sterilization of retarded persons in general hospitals, nor any statute which prohibits parents and/or guardians from giving legally sufficient consent to such sterilizations. The legal ambiguities generated by this legislative silence lie at the heart of plaintiffs' problems.

14. Conn.Gen.Stat. § 19–569g, P.A. No. 118 § 2, 1967:
   "The superintendent of the Mansfield Training School and the superintendent of The Southbury Training School are authorized and directed to appoint for each of said institutions two skilled surgeons, who, in conjunction with the physician or surgeon in charge at each of said institutions, shall constitute a board the duty of which shall be to examine such patients of said institutions as are reported to them, by the superintendent or the physician or surgeon in charge, to be persons by whom procreation would be inadvisable. Such board shall examine the physical and mental conditions of such persons, and if, in the judgment of a majority of such board, procreation by any such person would be inadvisable because he is incapable of comprehending the consequences of his actions, the superintendent of the institution shall make application to the probate court in

ents to submit the sterilization question to a board of doctors, and then to apply to a probate court for judicial authorization to perform the operations. There is a decided difference between having access to such a statutory procedure, by which authority for a sterilization may be obtained, and having the authority as parents to give valid consent.[15] The limits on the authority of the parents to give valid consent to a sterilization operation on their children will be considered first.

### The Parent-Child Relationship

■■■ When a parent decides to call a physician to care for her child, she may give lawful consent for him to administer that medical or surgical treatment which, in the doctor's professional opinion, is necessary or advisable for the health of her child. The parents' authority in their own household to direct the rearing of their children has a constitutional underpinning. The Supreme Court has said: "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither support nor hinder." *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944). Indeed, Connecticut has emphasized parental authority over matters of health by extending it even to parents who are themselves minors.[16] But this case is not concerned with the general problem of medical services for a child to which her

parent may consent, nor with the correlative duty upon the parent to provide them for her minor children.

Because surgical sterilization has an immediate effect, both upon the health of a patient and upon her ability to procreate, it impinges upon two separate interests. There is

> ". . . an important and legitimate interest in preserving and protecting the health of the pregnant woman . . . and . . . *another* important and legitimate interest in protecting the potentiality of human life. These interests are separate and distinct." *Roe v. Wade*, 410 U.S. 113, 162, 93 S.Ct. 705, 731, 35 L.Ed.2d 147 (1973) (emphasis in original).

*Cf. Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977).

So much has already been written to support the numerous decisions of the Supreme Court holding that a decision whether to bear or beget a child merits special constitutional protection, that it would be redundant to repeat it here.

■■■ In a line of constitutional cases stemming back to the Court's landmark opinion in *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), which held Connecticut's birth control law unconstitutional, it has been firmly established that

> "[i]f the right of privacy means anything, it is the right of the *individual*, married or single, to be free of unwarranted gov-

the district wherein such institution is located for consent for such board to appoint one of its members to perform the operation of vasectomy or tubal surgery, as the case may be, upon such person. Such operations shall be performed in a safe and humane manner, and shall be performed only with the written consent of the responsible next of kin or guardian of the person involved or, if there is none, with the approval of the board of trustees of the institution. The board making such examination and the surgeon performing such operation shall receive from the state such compensation for services rendered as the superintendent of either of said schools deems reasonable."

15. Recognizing that the first claim placed the parents in a position where there could well be

a conflict between their own interests and those of their children, the court deemed it advisable to appoint a guardian ad litem for each of the minor children. It is only because the court unmistakably indicated that the issue would be limited to the equal protection claim that the guardians ad litem confined themselves to the inquiry of whether the parents were acting in good faith *in seeking to present the case to a forum with authority to permit them to give consent* which their wards ad litem are incapable of granting.

16. Conn.Gen.Stat. § 19–142a(a) provides, in part: "Any minor who has been married or who has borne a child may give effective consent to medical, dental, health and hospital services for his or her child."

ernmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt v. Baird*, 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972) (emphasis in original).

The constitutional right of personal privacy protects a woman's decision to have an abortion from interference by a state or her spouse. *Roe v. Wade*, 410 U.S. at 152–54, 93 S.Ct. 705. In *Planned Parenthood v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), that concept was expanded to afford the same protection to minors:

> "Just as with the requirement of consent from the spouse, so here, the State does not have the constitutional authority to give a third party an absolute, and possible arbitrary, veto over the decision of the physician and his patient to terminate the patient's pregnancy, regardless of the reason for withholding the consent." *Id.* at 74, 96 S.Ct. at 2843.

*See also Poe v. Gerstein*, 517 F.2d 787 (5th Cir. 1975), *aff'd mem.*, 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976); *Lady Jane v. Maher*, 420 F.Supp. 318 (D.Conn.1976) (3-judge court), *aff'd mem. sub nom. Maloney v. Lady Jane*, 431 U.S. 926, 97 S.Ct. 2628, 53 L.Ed.2d 242 (1977). Without deviation, protection of the right of an individual to decide for oneself whether to "bear or beget" a child, before as well as after conception, was extended by the Court when it affirmed a district court decision which declared unconstitutional a New York statute prohibiting the distribution of contraceptives to children under the age of 16. *Carey v. Population Services International*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977).

■ While a decision to be sterilized, because of its irreversible effects, may be subjected to some requirements in order to insure that the decision is voluntary, the decision voluntarily made is entitled to the same constitutional protection as a decision to have an abortion. *Relf v. Weinberger*, 372 F.Supp. 1196, 1202–03 (D.D.C.1974), *vacated and remanded*, on remand *Relf v.*

*Mathews*, 403 F.Supp. 1235 (D.D.C.1975), *vacated as moot*, 184 U.S.App.D.C. 147, 565 F.2d 722 (1977). *Cf. Voe v. Califano*, 434 F.Supp. 1058 (D.Conn.1977). Thus, in *Bellotti v. Baird*, 428 U.S. 132, 146–47, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976), the Court held that a Massachusetts statute which might be construed by the Commonwealth's own Supreme Judicial Court to allow parents access to a court only for the purpose of obtaining assurance that their minor daughters' own decision to have an abortion was informed, could be distinguished, for constitutional purposes, from one which established a veto power in the guardian; and, that such a proceeding might be constitutional if it did not unduly burden the child's rights. *See also Maher v. Roe*, 432 U.S. at 473–74, 97 S.Ct. at 2832 (". . . the right protects the woman from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy.")

■ However, in this long line of cases which undeviatingly hold that the Constitution protects the freedom of even an immature teenager to decide for herself whether to bear or beget a child, no case has considered the question of who may make the sterilization decision for the child who is mentally incapable of deciding for herself. The fact that in this case the parents seek to have the children's rights exercised in favor of sterilization, rather than against it, does not affect the character of the right. They may neither veto nor give valid consent to the sterilization of their children.

It is this lack of authority in the parents that creates the problem presented by this case. Without authority to give consent themselves, the parents looked for a remedy that lay immediately at hand. As disclosed above, Connecticut has a statute which provides a method for obtaining judicial authority to perform a sterilization operation on mentally incompetent children of consenting parents. But the statute, which will be considered in more detail shortly, purports to authorize the use of that method only for children who are inmates of Connecticut's Mansfield and Southbury

Training Schools for mentally incompetent children. This limitation effectively excluded them from obtaining this remedy.[17] That brings us to the second claim of the plaintiffs, which is that the refusal to afford the plaintiffs the benefits of § 19–569g is an unconstitutional denial of equal protection.

This lawsuit is unmistakably a poignant cry for help from these children uttered in their behalf by their parents. These children are what they are; they are unable to come to terms with reality sufficiently to make the decisions which are only theirs to make.[18] That they are incapable of comprehending the consequences of their actions is clear beyond question. The fact that the demand for an "informed" decision from each of the children is an impossible one to meet makes imperative the need for an authoritative decision on their behalf.

### Equal Protection

The liberties guaranteed by the Constitution are real only in proportion to the extent that government protects them. Although Connecticut's law does not completely ignore the problem of a mentally incompetent minor's inability to give consent to a sterilization operation, it does not in terms specifically apply to the situation of the plaintiffs in this case because their children are not inmates of either the Mansfield or Southbury Training Schools.

The state has directed certain of its officials, at schools it maintains and conducts for mentally incompetent children, to create a "board" to

"examine the physical and mental conditions [of its patients], and if, in the judgment of a majority of such board, procreation by any such person would be inadvisable because he is incapable of

comprehending the consequences of his actions, the superintendent of the institution shall make application to the probate court in the district wherein such institution is located for consent for  . . .  one of its members to perform the operation of vasectomy or tubal surgery, as the case may be, upon such person  . . .  with the written consent of the responsible next of kin or guardian of the person involved   . . .." .Conn.Gen.Stat. § 19–569g.

The question then is whether it is a violation of the constitutional right of the plaintiffs to equal protection of the laws to deny them access to the method for obtaining valid consent to a sterilization operation as provided for in § 19–569g.

■ The equal protection clause of the fourteenth amendment commands that "[n]o State shall  . . .  deny to any person within its jurisdiction the equal protection of the laws." A state may violate the equal protection clause through a discriminatory classification that denies certain persons access to its courts. *Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). As an ideal, equality of access to the courts is important in itself, and in many cases, indispensable to a free society. However, judges may not decide cases on the basis of their ideals; they are required to apply legal principles.

■ Whether the plaintiffs have been denied access to the court in violation of the equal protection clause of the fourteenth amendment depends upon two factors. First, the interest which the plaintiffs seek to protect must be "fundamental." Second, the action of a court of law must be objectively necessary to protect that interest. If both of these are present, it is a violation of

---

**17.** Furthermore, the plaintiffs do not have the option of enrolling their children in the schools to overcome this limitation. Valerie's application for admission has been on the waiting list of both institutions since 1968. There is little likelihood that she or the other plaintiffs will be admitted because of the limited facilities coupled with the heavy demand for admission.

**18.** The guardians ad litem, Attorneys James Wade, Brenda Eckert and Richard Reynolds, appointed by the court to represent the interests of the children, have done that with highly commendable professional skill and unstinting dedication. At this point, the court wishes to express its gratitude for the assistance they have given to the court in the administration of justice in this case.

equal protection to deny them access to the court. *Boddie v. Connecticut, supra.* In *Boddie* the Court held that since adjustment of a marriage ("a fundamental human relationship") was sought and the state monopolized the means for dissolving that relationship, the requirement of due process [19] prohibited Connecticut from denying access to its courts to indigents who, in good faith, sought judicial dissolution of their marriages solely because of their inability to pay court fees and costs.[20] The monopolization of access is clearly present in this case since a "judicial proceeding [is] the only effective means for resolving the dispute at hand . . .." 401 U.S. at 376, 91 S.Ct. at 785. What has been shown earlier in this opinion is more than ample to demonstrate that the right of the plaintiffs' children to be sterilized is "fundamental" because it is rooted in the Constitution. And, in view of the fact that no one may subject them to a sterilization operation without their consent, "resort to the state courts is the only avenue," *Boddie,* 401 U.S. at 376, 91 S.Ct. at 785, to obtain valid consent for such operations. It is both subjectively and objectively impossible for valid consent of these plaintiffs' children to be otherwise obtained.

The reasons advanced by the defendants in their brief to justify the state for treating residents in its two institutions differently from all other mentally incompetent children are:

"Once institutionalized the state is responsible for the care of these individuals. To avoid problems of undesired pregnancy the state may rationally decide to sterilize some individuals. State officials might otherwise be subjected to liability for improper supervision if an institutionalized woman were to become pregnant. Some of the patients within the institution are wards of the state. Should one give birth, the state would be burdened by the additional expense of raising a child."

The interests which the state asserts may well justify it in establishing a method for obtaining authority to perform sterilization operations on *its* wards. The state is simply discharging a parental obligation. None of those interests will be jeopardized if the same statutory process is made available to those incompetent children who have not been institutionalized. If the state may rationally decide to sterilize some individuals to avoid incomprehensible pregnancy, it makes shamefully limited sense to contend that the same right should be denied to others in the same situation.

"Where certain 'fundamental rights' are involved, the Court has held that regulation limiting these rights may be justified only by a 'compelling state interest' [citations omitted] and that legislative enactments must be narrowly drawn to express only the legitimate state interests at stake." *Roe v. Wade,* 410 U.S. at 155, 93 S.Ct. at 728. Furthermore, "under the Equal Protection Clause the means chosen by the State . . . must bear 'a fair and substantial relation' to the object of the legislation. *Reed v. Reed,* 404 U.S. 71, 76 [92 S.Ct. 251, 254, 30 L.Ed.2d 225] (1971), *quoting Royster Guano Co. v. Virginia,* 253 U.S. 412, 415 [40 S.Ct. 560, 561, 64 L.Ed. 989] (1920); *Craig v. Boren,* 429 U.S. 190, 210–211 [97 S.Ct. 451, 463–464, 50 L.Ed.2d 397] (1976) (Powell, J., concurring)." *Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 688, 54 L.Ed.2d 618 (1978) (Powell, J., concurring). Exclusion of plaintiffs from the benefits of the statute is not necessary to further the state's interests; it is not even relevant. Denying to the plaintiffs as guardians the right the state has created for itself as guardian in-

---

**19.** The use of equal protection doctrine to support invalidation of laws significantly disadvantaging fundamental interests on due process grounds is not uncommon, *see, e. g., Boddie,* 401 U.S. at 377, 91 S.Ct. 780; *United States v. Kras,* 409 U.S. 434, 442, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973); *Johnson v. Robison,* 415 U.S. 361, 364 n. 4, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974). Whether the disadvantage is created by an invidious classification, or by the imposition of conditions which are fundamentally unfair, the justification for the state's action is measured by the same standards.

**20.** The payment for the surgery and for court costs is not in issue here. The plaintiffs are able and willing to shoulder those costs.

vidiously discriminates against the plaintiffs' children with respect to their fundamental interest in privacy. No matter what legal standard is used to test the state's refusal to permit the plaintiffs access to its method for obtaining consent, the defendants have not shown the justification which the equal protection clause requires for monopolizing the process for obtaining valid consent to a sterilization operation. *Boddie v. Connecticut, supra.*

It would be doing rather less than justice to omit stating that the defendants' failure to afford the plaintiffs the relief they seek is not based on their unwillingness, but rather on their belief that they lack the authority to do so. The statute to which they look for authority does not expressly prohibit them from acting under its terms to grant the plaintiffs' request. Nor does it indicate any purpose to discriminate in favor of one and against another class of mentally incompetent children. By narrowly limiting access to a process for securing consent so as to deny it to these plaintiffs, the state has denied them the equal treatment which is required to meet the standard of the equal protection clause. *See Department of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973); *New Jersey Welfare Rights Organization v. Cahill,* 411 U.S. 619, 93 S.Ct. 1700, 36 L.Ed.2d 543 (1973).

As shown above, the exclusion of these children from use of this state-created path to sterilization does not further any legitimate governmental interest, and therefore constitutes an invidious discrimination under even the most lenient standard of review. "Where a statute is defective because of underinclusion . . . a court . . . may extend the coverage of the statute to include those who are aggrieved by exclusion." (Citations omitted). *Welsh v. United States,* 398 U.S. 333, 361, 90 S.Ct. 1792, 1807, 26 L.Ed.2d 308 (1970) (Harlan, J., concurring in result). *See also Vaccarella v. Fusari,* 365 F.Supp. 1164 (D.Conn.1973)

(3-judge court). Before issuing an appropriate injunction to that end, there is another point to consider.

### Other Contentions

Various aspects of certain elements considered in this case have suggested a host of questions to the Connecticut Association for Retarded Citizens, Inc., Connecticut Association to End Sterilization Abuse, and the Connecticut Civil Liberties Union, who have joined to submit a brief as amici curiae. The question as to whether a state may order sterilization of persons despite their lack of consent is not involved in this case. Cf. *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); *Buck v. Bell,* 274 U.S. 200, 47 S.Ct. 584, 71 L.Ed. 1000 (1927). Nor is the question of which of several types of surgical procedures should be employed to effect sterilization one which is properly before this court; that is "a medical decision, and basic responsibility for it must rest with the physician. If an individual practitioner abuses the privilege of exercising proper medical judgment, the usual remedies, judicial and intra-professional, are available." *Roe v. Wade,* 410 U.S. at 166, 93 S.Ct. at 733. All that this court has ruled is that the plaintiffs are entitled to present their request for consent to sterilization to a state court through use of the statutory procedure.[21] In addition to those questions, amici also exhaustively brief their view that there is a "compelling need to mandate procedural and substantive safeguards for all persons subject to this potentially dangerous and irreversible procedure."

█ Insofar as procedural due process rights of the children will be involved in a hearing on an application for authorization to have a sterilization operation performed, there is a presumption that state courts will faithfully perform their duty to uphold the Constitution. *Huffman v. Pursue,* 420 U.S. 592, 611, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); *Stone v. Powell,* 428 U.S. 465, 493–

---

**21.** The risk in leaving the decision to have the sterilization operations in the hands of the parents because of the potential conflict of interests which amici were quick to remark upon was not over looked by the court. *See* note 18, *supra.*

94 n. 35, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *Mitchell v. National Broadcasting Co.*, 553 F.2d 265, 276 (2d Cir. 1977). Furthermore, there is no reason to assume that state court judges will be less sensitive to the advisability of appointing guardians ad litem to present the issue in an adversary context.[22]

Amici also urge this court to declare what standards should be applied by the state probate courts in determining whether to approve the application for authority to approve a sterilization operation upon a person incapable of giving informed consent. Because this question was so extensively presented by all counsel, a few observations may not be amiss.

▌▌▌▌▌ Amici urge the court to declare that the "best interests of the child" should be the legal standard for determining whether substitute consent may be authorized. They call attention to the use of such a standard in *Wyatt v. Aderholt*, 368 F.Supp. 1383, 1385 (M.D.Ala.1974). However, the matter cannot be disposed of so readily. That case did not purport to deal with the problem presented by individuals *incapable* of giving consent.[23] Where judicial approval is required to establish or modify legal relationships of children to others, *e. g.*, adoption, *Ciarleglio v. Shapiro*, 157 Conn. 596, 253 A.2d 34 (1968), the standard which a Connecticut court applies to govern "the exercise of its judicial discretion . . ." is, "what is best for the welfare of the child." *Howarth v. Northcott*, 152 Conn. 460, 464, 208 A.2d 540, 543 (1965). "And that involves not only his happiness at the moment, but his chance of happiness in the future. The court must determine, as best it can, what disposition of the case will be most beneficial to the

child in years to come." *Anderson v. Anderson*, 122 Conn. 600, 603, 191 A. 534, 535 (1937). *See also Quilloin v. Walcott*, 434 U.S. 246, 98 S.Ct. 549, 555, 54 L.Ed.2d 511 (1978) ("[W]e cannot say that the State was required in this situation to find anything more than that the adoption, and denial of legitimation, was in the 'best interests of the child.' ") Those cases do not come to grips with the question in this case. The problem here cuts deeper than the creation or modification of the legal relationship between a child and its guardian. The right to "bear or beget a child" is a salient right of a child which has been set apart from parental control. Its exercise is solely in the child, and neither a parent nor guardian can thwart her decision to be sterilized even though she exercises it capriciously, arbitrarily, or contrary to her own "best interests." When a similar problem was presented in the context of a decision as to whether to continue chemotherapy treatments to prolong the life of a mentally incompetent man stricken with invariably fatal leukemia, the Massachusetts Supreme Judicial Court in *Superintendent of Belchertown State School v. Saikewicz*, 370 N.E.2d 417 (1977) ignored the "best interests" test and rejected the objective "reasonable person" test of what a majority of people would do under like circumstances. The court recognized the doctrine of "substituted judgment," stating at 431,

> "We believe that both the guardian ad litem in his recommendation and the judge in his decision should have attempted (as they did) to ascertain the incompetent person's actual interests and preferences. In short, the decision in cases such as this . . . ."[24]

22. An example of the deep perception and care, in a manner at once exhaustive and open, which state court judges bring to bear in applying the doctrine of substituted judgment in cases involving surgical procedures upon legally incompetent minors is found in the opinion of Judge Testa in *Hart v. Brown*, 29 Conn.Supp. 368, 289 A.2d 386 (1972).

23. In *Wyatt*, the court was dealing with sterilization operations performed on inmates of an Alabama mental institution who consented to

the operation. The safeguards which it ordered were designed to furnish assurance that the consent was fully informed.

24. Based on the viewed facts the court upheld the order of the probate court authorizing the guardian to withhold the chemotherapy treatment. Such a formulation lays more stress on what the individual would have done; but a test which calls for the projection of an adult viewpoint into the mind of an individual to function alongside one which has long been

For a similar ad hoc approach authorizing the withdrawal of life support treatment from an irreversibly comatose child upon concurrence of the guardian and family, and with the assurances of hospital authorities that there was no possibility that she would ever emerge from that comatose condition, see *In re Quinlan*, 70 N.J. 10, 355 A.2d 647, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976). In *Hart v. Brown, supra*, 29 Conn.Supp. at 371, 289 A.2d at 388, the court applied the "doctrine of substituted judgment" to permit natural parents to consent to a kidney transplant from a daughter aged 7 years and 10 months to her identical twin "after a close, independent and objective investigation of their motivation and reasoning," which included "participation of a clergyman, the defendant physicians, an attorney guardian ad litem for the donor . . . [and] donee . . ." *Id.* 375–76, 289 A.2d 390. If a conceptual standard were to be abstracted from that case, it might be that authorization for valid substitute consent may be given where the court finds that the guardian is "fully informed" and is acting in "good faith." This may be loosely woven, but the concepts are not new in the fabric of law. They cover a wide range and are not likely to be outwitted if left in the hands of a court for determination before authorization to consent is ordered.

It is understandable that from these few cases no widely approved jurisdictional basis for authorizing substituted consent has yet been formulated. Not only would a premature adjudication of a hypothetical disagreement be inadvisable, but the view I have taken of the case makes it unnecessary for me to establish a standard for the state court to follow. And, most certainly, "[i]t is important that this Court not indulge in needless dissertations on constitutional law." *Minnesota v. National Tea Co.*, 309 U.S. 551, 557, 60 S.Ct. 676, 679, 84 L.Ed. 920 (1940).

The plaintiffs also press a suggestion. Instead of being required to get on the same track as inmates of Mansfield and Southbury, the plaintiffs argue that they should be able to make direct application to a probate court in the district where they reside, on a showing by them through physicians or surgeons of their own choice. While a law to that effect would make good sense, and hopefully would so be regarded by the Connecticut Legislature, I am without power to rewrite it. The need for prompt surgical intervention in abortion cases is not present to the same degree in a sterilization case. I do not believe that being required to follow the route laid out in the statute is unduly burdensome. Indeed, there may be an additional safeguard to the rights of the children by having their cases considered by those who make a professional career of caring for mentally incompetent children.[25] As stated by Connecticut's Supreme Court in *Howarth v. Northcott*, 152 Conn. at 465, 208 A.2d at 543:

> "[W]hen the welfare of a child is the paramount concern . . . the court should have available to it the broadest possible base upon which to determine what course will best serve the welfare and happiness of the child."

Just as it is not appropriate for this court to lay down guidelines or rules either procedural or substantive for the state courts to follow in cases of substituted consent for sterilization operations, it is inappropriate for this court to rewrite the statute. I decline both the invitation of the plaintiffs and that of the defendants to make new law.

Accordingly, it is the order of this court that the defendants are enjoined from refusing to provide the plaintiffs with services identical to those provided to inmates of the Mansfield Training School and the Southbury Training School to enable them

---

incompetent of functioning rationally, is not entirely convincing.

**25.** The very enactment of § 19–569g reveals that a primary factor in providing for valid

substitute consent to sterilization is the preconceived incapacity of the common law and state legislators to do so without the medical opinions of qualified physicians in every case.

to obtain, consent of a probate court to the sterilization operations upon them.

SO ORDERED.