IN RE GUARDIANSHIP OF PESCINSKI: LAUSIER, Appellant,
v. PESCINSKI, Respondent.

*No. 668. Argued February 24, 1975.—Decided February 25, 1975.—*
*Opinion filed March 4, 1975.*
(Also reported in 226 N. W. 2d 180.)

DAY, J., dissents.

For the appellant there was a brief and oral argument by *Eugene A. Kershek* of Milwaukee.

For the respondent there was a brief by *Stephen O'Meara,* guardian *ad litem,* and *O'Meara & O'Meara,* all of West Bend, and oral argument by *Stephen O'Meara.*

WILKIE, C. J.   Does a county court have the power to order an operation to be performed to remove a kidney of an incompetent ward, under guardianship of the person, and transfer it to a sister where the dire need of the transfer is established but where no consent has been given by the incompetent or his guardian *ad litem,* nor has any benefit to the ward been shown?

That is the issue presented on appeal here. The trial court held that it did not have that power and we agree. The appellant, Janice Pescinski Lausier, on her own petition, was appointed guardian of the person of her brother, the respondent, Richard Pescinski. In 1958, Richard was declared incompetent and was committed to Winnebago State Hospital. He has been a committed

mental patient since that date, classified as a schizophrenic, chronic, catatonic type.

On January 31, 1974, Janice Pescinski Lausier petitioned for permission to Dr. H. M. Kauffman to conduct tests to determine whether Richard Pescinski was a suitable donor for a kidney transplant for the benefit of his sister, Elaine Jeske. Elaine had both kidneys surgically removed in 1970, because she was suffering from kidney failure diagnosed as chronic glomerulonephritis. In order to sustain her life, she was put on a dialysis machine, which functions as an artificial kidney. Because of the deterioration of Elaine, the petition contended that a kidney transplant was needed. Subsequent tests were completed establishing that Richard was a suitable donor, and a hearing was then held on the subject of whether permission should be granted to perform the transplant. The guardian *ad litem* would not give consent to the transplant and the county court held that it did not have the power to give consent for the operation.

At the time of the hearing Elaine was thirty-eight and her brother Richard was thirty-nine. Evidence was produced at the hearing that the other members of the Pescinski family had been ruled out as possible donors on the basis of either age or health. The father, aged seventy, and the mother, aged sixty-seven, were eliminated as possible donors by Dr. Kauffman because, as a matter of principle, he would not perform the operation on a donor over sixty. A similar rationale was applied by Dr. Kauffman as to all of the six minor children of Elaine, the doctor concluding that he "would not personally use their kidneys" as a matter of his "own moral conviction." Mrs. Jeske's sister, Mrs. Lausier, was excluded as a donor because she has diabetes. Another brother, Ralph Pescinski, testified that he was forty-three years old, had been married twenty years

and had ten children, nine of whom remained at home. He is a dairy farmer and did not care to be a donor because there would be nobody to take over his farm and he felt he had a duty to his family to refuse. He further testified that he had a stomach disorder which required a special diet and had a rupture on his left side. He had been to see Dr. Capati at the Neillsville Clinic, who told him he should not get involved and that his family should come first.

The testimony showed that Richard was suffering from schizophrenia—catatonic type, and that while he was in contact with his environment there was marked indifference in his behavior. Dr. Hoffman, the medical director at the Good Samaritan Home, West Bend, Wisconsin, testified that in layman's terms Richard's mental disease was a flight from reality. He estimated Richard's mental capacity to be age twelve. No evidence in the record indicates that Richard consented to the transplant. Absent that consent, there is no question that the trial court's conclusion that it had no power to approve the operation must be sustained.

"A guardian of the person has the care of the ward's person and must look to the latter's health, education, and support." [1] The guardian must act, if at all, "loyally in the best interests of his ward." [2] There is absolutely no evidence here that any interests of the ward will be served by the transplant.

As far as the court's own power to authorize the operation, we are satisfied that the law in Wisconsin is clearly to the contrary. There is no statutory authority given the county court to authorize a kidney transplant or any other surgical procedure on a living person. We decline to adopt the concept of "substituted judgment" which was specifically approved by the Kentucky Court

[1] 39 Am. Jur. 2d, *Guardian and Ward,* p. 60, sec. 68.
[2] *Guardianship of Nelson* (1963), 21 Wis. 2d 24, 32, 123 N. W. 2d 505. *Cf.* sec. 880.19 (5) (b), Stats.

of Appeals in *Strunk v. Strunk*.[3] In that case, the Kentucky court held a court of equity had the power to permit the removal of a kidney from an incompetent ward of the state upon the petition of his committee who was also his mother. Apparently a committee in Kentucky is like a guardian in this state. The Kentucky Court of Appeals authorized the operation based on the application of the doctrine of substituted judgment. However, the court also held that neither the committee nor the county court had the power to authorize the operation, in the absence of a showing that the life of the ward was in jeopardy—only the Court of Appeals had the power. In the instant case the county court had no power to authorize the procedure, and the question is whether this supreme court can by using the doctrine of substituted judgment.

As the dissenting opinion in *Strunk v. Strunk* points out, "substituted judgment" is nothing more than an application of the maxim that equity will speak for one who cannot speak for himself. Historically, the substituted judgment doctrine was used to allow gifts of the property of an incompetent. If applied literally, it would allow a trial court, or this court, to change the designation on a life insurance policy or make an election for an incompetent widow, without the requirement of a statute authorizing these acts and contrary to prior decisions of this court.[4]

We conclude that the doctrine should not be adopted in this state.

We, therefore, must affirm the lower court's decision that it was without power to approve the operation, and we further decide that there is no such power in this court. An incompetent particularly should have his own interests protected. Certainly no advantage should be taken of him. In the absence of real consent on his part,

---

[3] (Ky. 1969), 445 S. W. 2d 145.

[4] *Kay v. Erickson* (1932), 209 Wis. 147, 244 N. W. 625; *Van Steenwyck v. Washburn* (1884), 59 Wis. 483, 17 N. W. 289.

and in a situation where no benefit to him has been established, we fail to find any authority for the county court, or this court, to approve this operation.

*By the Court.*—Order affirmed. No costs on this appeal.

DAY, J. *(dissenting)*. I would reverse the decision in this case. The majority of the court holds that in the absence of a showing of "benefit" to the incompetent in this case or proof of consent on his part, the trial court and this court lack authority to authorize a kidney transplant operation to be performed on him to save the life of his sister. I disagree.

I think the court as a court of equity does have authority to permit the kidney transplant operation requested in the petition of the guardian of Richard Pescinski. I agree with the reasoning of the Court of Appeals of the state of Kentucky wherein that court said:

"The specific question involved upon this appeal is: Does a court of equity have the power to permit a kidney to be removed from an incompetent ward of the state upon petition of his committee, who is also his mother, for the purpose of being transplanted into the body of his brother, who is dying of a fatal kidney disease? We are of the opinion it does." *Strunk v. Strunk* (Ky. 1969), 445 S. W. 2d 145, 35 A. L. R. 3d 683.

That case involved the authorization of a transplant from a twenty-seven-year-old incompetent to his twenty-eight-year-old brother. The court in that case did find, based on the testimony of a psychiatrist, that while the incompetent had the mental age of six, it would be of benefit to him to keep his brother alive so that his brother could visit him on occasion; I would regard this as pretty thin soup on which to base a decision as to whether or not the donee is to be permitted to live. In the case before us, if the incompetent brother should happily recover from his mental illness, he would undoubtedly

be happy to learn that the transplant of one of his kidneys to his sister saved her life. This at least would be a normal response and hence the transplant is not without benefit to him.

The guardian *ad litem* for the incompetent in this case has interposed strong objection to the transplant from Richard Pescinski to his sister, who at the time of the determination, was a thirty-nine-year-old mother of six minor children and who, as we were informed on February 24th at the time of oral arguments, in attempting to live on a bi-weekly "washing" of her blood through a kidney dialysis machine has now deteriorated to the point of confinement in a wheelchair. We were advised that without a kidney transplant death for her is quite imminent. The brother, on the other hand, the incompetent, is in good health. The medical testimony is that the removal of one of his kidneys would be of minimal risk to him and that he would function normally on one kidney for the rest of his natural life, as do thousands of others in similar circumstances. The guardian *ad litem* argues strenuously that for us to permit this transplant is to bring back memories of the Dachau concentration camp in Nazi Germany and medical experiments on unwilling subjects, many of whom died or were horribly maimed. I fail to see the analogy— this is not an experiment conducted by mad doctors but a well-known and accepted surgical procedure necessitated in this case to save the life of the incompetent's sister. Such a transplant would be authorized, not by a group of doctors operating behind a barbed-wire stockade but only after a full hearing in an American court of law. To avoid the concerns expressed by the guardian *ad litem*, there are certain definite standards which could and should be imposed. First of all, a strong showing should be made that without the kidney transplant the proposed donee or recipient stands to suffer death. This is certainly the evidence here. Secondly, that reasonable

steps have been taken to try and acquire a kidney from other sources and the record is clear that such attempt was made here. Because of the fact that the donee has had six children, she has built up certain chemical resistance to the receipt of foreign tissue into her body which can be overcome only by a transplant from one close to her by blood such as a brother or sister. The testimony showed the impracticality of acquiring a kidney from either her other brother or her sister. No suitable kidney from a cadaver has been found since her kidneys were removed in 1970. The next showing that should be made is that the incompetent proposed donor is closely related by blood to the proposed donee, such as a brother or sister, which of course is the case here. Showing should be made that the donor, if competent, would most probably consent because of the normal ties of family. Here, the trial court specifically found ". . . the conclusion would appear to be inescapable that the ward [the incompetent proposed donor] would so consent and that such authorization should be granted." [1] Another showing should be that the proposed incompetent donor is in good health and that was shown here. And lastly, that the operation is one of minimal risk to the donor and that the donor could function normally on one kidney following such operation. The medical testimony is all to the effect that the donor would undergo minimal risk and would be able to function normally on one kidney. In fact, the testimony is that a person can function on as little as one tenth of one normal kidney.

With these guidelines the fear expressed that institutions for the mentally ill will merely become storehouses for spare parts for people on the outside is completely

[1] The trial court concluded, however, that such an authorization would be analogous to giving away an incompetent's property and since there was no "benefit" to him the court had no authority to act.

unjustified. I agree with the trial court that if the brother here were competent in all probability he would be willing to consent to the transplant to save his sister's life. For him it would be a short period of discomfort which would not affect his ability either to enjoy life or his longevity.

The majority opinion says there is no showing of consent by the incompetent. Dr. William C. P. Hoffman, medical director of the Good Samaritan Home where the incompetent is a patient, testified that one with the mental condition of the incompetent has no lucid intervals and that his reasoning is completely impaired in making decisions. The doctor testified the incompetent would not be aware of what the proceedings involved and testified the incompetent is "insane seven days a week." From such a record it is difficult to see how one could ever get a meaningful "consent" from the incompetent in this case.

The majority opinion would forever condemn the incompetent to be always a receiver, a taker, but never a giver. For in holding that only those things which financially or physically benefit the incompetent may be done by the court, he is forever excluded from doing the decent thing, the charitable thing. The British courts have not so held. Two British cases cited in *Strunk* permitted the estate of an incompetent to provide a pension for a faithful servant in one instance and in another to help an indigent brother—this by the device known as "substituted judgment" where the court in effect does for the incompetent what it is sure he would do himself if he had the power to act. This approach gives the incompetent the benefit of the doubt, endows him with the finest qualities of his humanity, assumes the goodness of his nature instead of assuming the opposite.

The equities in this case favor taking the action which may save this mother's life.