Anne LITTLE, NCM, Appellant,

v.

Margaret LITTLE, Appellee.

No. 16226.

Court of Civil Appeals of Texas,
San Antonio.

Feb. 7, 1979.

R. H. Wester, Jr., Seguin, C. Dayle Bebee (amicus curiae), Peter Brooks, Sandra Hale Adams, Advocacy, Inc., Austin, for appellant.

Threlkeld, Saegert, Saegert, Kirkendall & Frost, W. C. Kirkendall, Seguin, for appellee.

## OPINION

CADENA, Chief Justice.

Anne Little, who has been adjudged incompetent, appeals through her attorney ad litem from an order of the probate court of Guadalupe County authorizing her mother and guardian, Margaret Little, to consent to a surgical procedure involving the removal of a kidney from Anne's body for the purpose of transplanting such kidney into the body of Anne's younger brother, Stephen, who is suffering from endstage renal disease.

On August 8, 1978, Anne, then aged 14, was declared to be of unsound mind and her mother, appellee here, was appointed guardian of the person and of the estate of Anne. No effort was made to proceed under the Limited Guardianship provisions of the Probate Code which make possible the appointment of a guardian without requiring a finding of mental incompetency. Tex. Prob.Code Ann. § 130A (Vernon Supp.1978–1979). One week later, on August 15, 1978, the guardian filed this application for an order authorizing the transplant operation. The guardian, after alleging the nature of Stephen's illness and the fact that a kidney transplant is the only acceptable medical alternative to continued dialysis treatment for Stephen, pointed out that Anne is the only living related donor with acceptable matching characteristics and that permitting Anne to donate her kidney to her brother would be in Anne's best interest and would result in "great and tangible" benefits to her. The guardian added that the operation would present no threat to Anne's life and that "to the best of her ability and comprehension" Anne desires to donate her kidney to her brother and would do so if she were competent to make such decision.

The attorney ad litem appointed by the court to represent Anne's interests filed an answer opposing the operation and the authorization sought by the guardian on the ground that there was no constitutional or statutory provision empowering the probate court to authorize removal of an incompetent's kidney for the purpose of benefiting a person other than the incompetent. In this case this court has had the benefit of extremely helpful briefs by counsel for the guardian and the attorney ad litem as well as an extensively researched amicus brief filed by Advocacy, Incorporated, a nonprofit federally funded corporation dedicated to the protection of the rights of "developmentally disabled Texans." The brief filed by amicus in this case truly deserves the designation as a gesture by a "friend of the court"; it expresses no opinion on the question of whether the judgment of the probate court in this case should be affirmed or reversed, but limits itself to an effort to insure that this court be furnished with as much relevant information as possible.

■■■■■ **495**

■ The general rule in this State is that a minor cannot consent to medical or surgical treatment. No claim is here made that this case comes within the statutory exceptions to this rule. See Tex.Fam.Code Ann. § 35.03 (Vernon 1975). Persons adjudged to be mentally incompetent share the same disability to consent to medical or surgical treatment. *See* 45 Tex.Jur.2d, *Physicians and Other Healers* § 101 (1963). Parents whose parental rights have not been terminated and managing conservators of minors are authorized to consent to medical and surgical treatment of minors. Tex.Fam.Code Ann. §§ 12.04(6), 14.02(b)(5). The guardian of a mentally incompetent person has the same powers and duties as does the managing conservator of a minor. *In re Guardianship of Henson,* 551 S.W.2d 136 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n. r. e.). Significantly, however, for our purposes, this power of parents, managing conservators and guardians to consent to surgical intrusions upon the person of the minor or ward is limited to the power to consent to medical "treatment." *See* Tex.Fam.Code Ann. § 12.04(6) (Vernon Supp.1978–1979); Tex.Prob.Code Ann. § 229 (Vernon 1956); *In re Guardianship of Henson,* 551 S.W.2d 136 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n. r. e.). Even ascribing to the word "treatment" its broadest definition, it is, nevertheless, limited to "the steps taken to effect a cure of an injury or disease . . . including examination and diagnosis as well as application of remedies." Black's Law Dictionary 1673 (rev. 4th ed. 1968).

■ We cannot accept the guardian's argument that a donor nephrectomy constitutes medical treatment for the donor. In this case the ward's mental incompetency results from the fact that she suffers from Down's Syndrome, often called "mongolism," which is caused by a "specific chromosomal abnormality which occurs most frequently as an unpredicatable non-disjunction of autosome 21" or, less frequently, "as the Mendelian transmission of a translocated portion of autosome 21." See Presi-

dent's Comm. on Mental Retardation, Mental Retardation: Past and Present, at 149 (1977). Since the guardian does not contend that removal of a kidney is a medically acceptable method of curing or treating Down's Syndrome, Family Code Sections 12.04(6) and 14.02(b)(5) are inapplicable. We think it is clear that the medical procedure authorized by the probate court in this case constitutes "treatment" of the ward's brother, Stephen, and that the proposed medical procedure has as its purpose curing, remedying or ameliorating the condition of the proposed donee of the ward's kidney. The fact that the proposed surgical procedure cannot be classified as medical treatment of the ward in this case is made apparent by the medical testimony that a donor nephrectomy is medically acceptable, generally, only if the donor is in good health. All of the testimony in this case stresses the fact that the ward is being considered as a donor only because she is in good health and there are no signs of the upper respiratory problems and hypertension frequently associated with mongolism.

Our legislature has not specifically addressed the problem of organ transplants in cases where the proposed donor is a minor or a non-resident mental incompetent who is incapable of giving legally adequate consent to the surgical invasion of his body.[1] The Anatomical Gift Act deals exclusively with anatomical gifts to take effect upon the death of the donor and limits such donations by living persons to those who have testamentary capacity under the Probate Code, although it does provide for gifts of bodies, or parts of bodies, of deceased persons by specified survivors. Tex.Rev.Civ. Stat.Ann. art. 4590–2 (Vernon 1976).

■ We are not persuaded by the guardian's argument that the Mentally Retarded Persons Act of 1977 can be construed as a legislative recognition of the right of a minor or mental incompetent to participate as a donor in an organ transplant operation. Tex.Rev.Civ.Stat.Ann. art. 5547–300 (Vernon Supp. 1978–1979). Subchapter E, sec-

---

1. *See generally* Tex.Rev.Civ.Stat.Ann. art. 5547–300 § 3 (Vernon Supp.1978–1979).

tion 24(c) of that statute expressly prohibits the Texas Department of Mental Health and Mental Retardation from performing unusually hazardous treatment procedures, experimental research, nontherapeutic surgery for experimental research or organ transplantations on residents of state institutions for the mentally retarded. The guardian contends that the legislature, by enacting such restrictions on the Department, must have acted on the belief that the Department, absent such prohibition, would have the authority to engage in these prohibited activities. The guardian further infers that since the statute imposes no restrictions on donations of organs by "non-resident" incompetents, the legislature must therefore have intended to permit the donation of organs by such non-residents.

We reject guardian's argument as being untenable. If guardian's theory of statutory construction is adopted a court would have to hold that a guardian or court can consent to the performance of unusually dangerous nontherapeutic surgery on a non-resident ward, which may have no benefit to the ward. We think that section 24(c) can be explained as reflecting legislative familiarity with widespread reports, whether true or not, regarding exploitation of "residents" of governmental institutions who are unwilling or less than fully informed participants in programs sought to be justified as attempts to achieve medical or scientific "progress." Further, we cannot logically construe section 24(c) as permitting transplants on non-residents while rejecting such interpretation as to experimental nontherapeutic surgery or other highly dangerous experimental medical procedures.

The guardian relies heavily on the decision of the Kentucky Court in *Strunk v. Strunk*, 445 S.W.2d 145 (Ky.1969). In that case, the proposed donee of the kidney was suffering from endstage renal disease, as is Stephen in the case before us, and, again, like Stephen, he was being kept alive by hemodialysis, which consists of filtering the blood of the afflicted person through an external artificial kidney. The donee's brother in *Strunk* was an institutionalized

ward of the state who had an I. Q. of about 35, was tested and was found highly compatible as the donor of the required kidney. The "committee" of the incompetent (analogous to a guardian under the Texas law), who was the mother of both the incompetent and the victim of the renal disease, petitioned the court for authority to consent to the transplant, using the kidney of the incompetent. The court, by a 4–3 decision, authorized the transplant, apparently relying on four grounds:

(1) The power of equity to provide for others from the estate of an incompetent, as the incompetent himself would do if not disabled, applies to matters of "personal affairs" as well as to matters of property. This doctrine of "substituted judgment" is broad enough to encompass "all matters touching on the well-being of the ward," including the donation of a kidney for his psychological benefit. 445 S.W.2d at 148;

(2) Psychiatric testimony supported the conclusion that the operation would be beneficial to the incompetent because his brother's death would be psychologically detrimental. The court was also apparently impressed by the argument of amicus, the Kentucky Department of Mental Health, which pointed out that mental defectives have a need for close intimacy and that since the defective identified with his ill brother and the family, the sick brother's life was vital to the incompetent's well-being. Amicus also argued that the incompetent's awareness that he could play a vital role in easing familial tensions would generate feelings of guilt if the incompetent failed to act and his brother died. *Id.* at 146–47;

(3) The chance of a successful kidney transplant is greatly increased where donor and donee are genetically related. *Id.* at 148;

(4) The operation involved only minimal risk to the donor. *Id.* at 148–49.

No useful purpose would be served by detailing the evidence in this case. We will merely say that the evidence before us closely parallels that on which the Ken-

tucky court relied in *Strunk.* Additionally, there was medical testimony in this case that, for purposes of a kidney transplant, the ward and Stephen were a perfect "match," and that the use of any other member of the family or a non-related donor would significantly lessen the chances for a successful transplant. The undisputed testimony here also established that the chances of obtaining a suitable kidney from a cadaver were extremely remote.

Judicial approval for intra-family transplants from incompetent donors has been granted in most cases. Robertson, *Organ Donations by Incompetents and the Substituted Judgment Doctrine,* 76 Colum.L.Rev. 48, 53 (1976). In at least two cases, however, courts have refused to authorize transplants from incompetent donors. *Lausier v. Pescinski,* 67 Wis.2d 4, 226 N.W.2d 180 (1975); *In re Richardson,* 284 So.2d 185 (La.Ct.App.), *cert. denied,* 284 So.2d 338 (La.1973). In *Lausier,* the court justified its refusal to authorize a transplant by noting the absence of specific statutory authority and calling attention to Wisconsin decisions denying the power of a guardian to make gifts from the estate of his ward. However, the following language in the opinion is, perhaps, significant:

> An incompetent particularly should have his own interests protected. Certainly no advantage should be taken of him. In the absence of real consent on his part, and in a situation where no benefit to him has been established, we fail to find any authority for the county court, or this court, to approve this operation.

226 N.W.2d at 182. The lone dissenter brushed aside "benefit" to the incompetent as "pretty thin soup on which to base a decision as to whether or not the donee is to be permitted to live," but would have permitted the transplant by applying the substituted judgment doctrine's standard which would make the decision turn on what the donor would do if he were competent, concluding that in all probability the incompetent would consent because for him "it would be a short period of discomfort which would not affect his ability either to enjoy life or his longevity." *Id.* at 182–83.

The dissenter did not choose to explain how ignoring benefits to the incompetent while speculating as to the choice the donor would make if competent would result in a "thicker soup."

In *Richardson,* the Louisiana court, in refusing to authorize the operation, pointed out that the facts in *Strunk,* "particularly the conclusion relative to the 'best interest' of the incompetent, are not similar to the facts in the instant case . . .." 284 So.2d at 187. The court also pointed out that under Louisiana law a guardian is prohibited from making any donations of the ward's property.

> Since our law affords this unqualified protection against intrusion into a comparatively mere property right, it is inconceivable to us that it affords less protection to a minor's right to be free in his person from bodily intrusion to the extent of loss of an organ unless such loss be in the best interest of the minor.

*Id.* The court then noted that such statement and its conclusion were "restricted to the facts of the present case."

■ The substituted judgment doctrine was apparently first applied in 1816 by Lord Eldon. Its stated purpose was to authorize gifts from an incompetent's estate to persons to whom the incompetent owed no duty of support. *Ex parte Whitebread,* 35 Eng.Rep. 878. The doctrine is based on the principle that a court will not refuse to act if it is probable that the incompetent would have taken the same action had he been normal. The doctrine requires that the court "substitute itself as nearly as may be for the incompetent and to act upon the same motives and considerations as would have moved" the incompetent. *City Bank Farmers Trust Co. v. McGowan,* 323 U.S. 594, 599, 65 S.Ct. 496, 498, 89 L.Ed. 483 (1945).

The substituted judgment doctrine has been adopted in some jurisdictions and rejected in others. See Comment, *Gifts by Guardians: Texas Rejects Substitution of Judgment Doctrine,* 19 Baylor L.Rev. 411, 418–30 (1967). In Texas, it has been held

that the guardian of the estate of an incompetent lacks the power to make a gift from the estate of the ward, even though the evidence establishes that the ward, if competent, would have made such a gift. *In re Guardianship of Estate of Neal,* 406 S.W.2d 496 (Tex.Civ.App.—Houston [1st Dist.]), *writ ref'd n.r.e. per curiam,* 407 S.W.2d 770 (Tex.1966). Significantly, in refusing the application for writ of error, the Supreme Court expressly approved the holding of the Court of Civil Appeals that the proposed gift did not satisfy the requirements of the Probate Code and that "the probate court is without power to authorize the same even though it appears (1) that the ward, if competent, would make the gift, and (2) that a prudent man owning and managing the ward's estate would make the gift." 407 S.W.2d at 771. The purpose of the gift to the residuary legatees under the ward's will was to minimize estate taxes which would become due upon the death of the ward, and the trial court found that the proposed gift, if permitted, would reduce estate taxes by a minimum of $240,000.00. The evidence showed that prior to the onset of her incompetence, the ward had made gifts to the proposed donees totaling approximately $2,500,000.00 and that such gifts were at least partially motivated by a desire to minimize estate taxes by reducing the size of her estate. Subsequent to the *Neal* decision the Probate Code was amended to permit a guardian to make gifts from the ward's estate under certain circumstances for the purpose of minimizing estate taxes. Tex.Prob.Code Ann. § 230(b)(2) (Vernon Supp.1978–1979).

It is clear in transplant cases that courts, whether they use the term "substituted judgment" or not, will consider the benefits to the donor as a basis for permitting an incompetent to donate an organ. Although in *Strunk* the Kentucky Court discussed the substituted judgment doctrine in some detail, the conclusion of the majority there was based on the benefits that the incompetent donor would derive, rather than on the theory that the incompetent would have consented to the transplant if he were competent. We adopt this approach. As already pointed out, the courts in *Lausier* and *Richardson,* in refusing to approve the transplant operations on the basis of the substituted judgment doctrine, pointed to the lack of evidence showing that the incompetent donors would realize benefits from the operations. In *Neal,* the case which is frequently referred to as rejecting the substituted judgment doctrine in Texas, the detailed findings of fact by the trial court made no mention of any benefit to the person of the incompetent, as distinguished from benefit to the estate of the ward—a benefit which would not be realized until after the death of the ward. The Supreme Court's approval of the civil appeals holding in *Neal* does no more than assert that a gift of the ward's property is not authorized merely because it is established that the ward, if competent, would make the gift and that a prudent man owning and managing the estate would make the gift. Thus, there is no Texas case holding that an action by a guardian is unauthorized where the ward, if competent, would so act, and such action would result in benefits to the ward which he would enjoy during his lifetime.

We do not assert that the evidence in this case is sufficient to establish that Anne has the mental capacity to fully understand the concept of death. The suggestion, accepted in *Strunk,* that an incompetent potential donor would be subjected to feelings of guilt if his sibling died because the transplant did not take place may also, perhaps, be taken with a grain of salt. But the testimony in this case conclusively establishes the existence of a close relationship between Anne and Stephen, a genuine concern by each for the welfare of the other and, at the very least, an awareness by Anne of the nature of Stephen's plight and an awareness of the fact that she is in a position to ameliorate Stephen's burden. Assuming that Anne is incapable of understanding the nature of death, there is ample evidence to the effect that she understands the concept of absence and that she is unhappy on the occasions when Stephen must leave home for hours when he journeys to

San Antonio for dialysis. It may be conceded that the state of development of the behavioral arts is such that the testimony of psychiatrists and psychologists must still be classified as speculative, but, as of today, that has not been accepted as justifying a judicial rejection of the value of such testimony. Indeed, on the basis of such speculative testimony, citizens are deprived of their freedom so that they may be treated for mental illness, and in criminal prosecutions persons are condemned to death on the basis of psychiatric testimony concerning their propensity to engage in certain types of conduct in the future.

Nor is it fair to say that the evidence concerning "psychological" benefits to Anne consists merely of testimony as to the prevention of detrimental effects which she may suffer if Stephen dies. The testimony is not limited to the prevention of sadness. There is uncontradicted testimony relating to increased happiness. Studies of persons who have donated kidneys reveal resulting positive benefits such as heightened self-esteem, enhanced status in the family, renewed meaning in life, and other positive feelings including transcendental or peak experiences flowing from their gift of life to another. Robertson, *supra,* 76 Colum.L. Rev. at 68; Arrow, *Gifts and Exchanges,* 1 Philos. & Public Affairs 343 (1972); Fellner, *Organ Donation—For Whose Sake?,* 79 Annals of Internal Medicine 589 (1973). The record before us indicates that Anne is capable of experiencing such an increase in personal welfare from donating her kidney.

The medical experts who testified in this case conceded that Anne would experience pain and discomfort, but they all referred to it as minimal, and there is evidence that Anne has a high pain threshold. There is however, the possibility that Anne, because of her limited intellectual development, may be less able to understand the transplant procedures or to adapt to the unfamiliar surroundings of a hospital, so that her ordeal may be more burdensome than that of a normal adult. We must assume that all of these possibilities were carefully weighed by the trial judge, who had the opportunity to observe Anne and to hear her unsworn answers to questions, some of which were suggested by the court.

The circumstances of this case may be fairly summarized as follows:

(1) The parents and guardian of Anne consent to the kidney donation by Anne;

(2) Although Anne's statement that she was willing to donate her kidney to her brother cannot be realistically viewed as a knowing consent, there is no evidence indicating that she has been subjected to family pressure and the trial judge took the precaution, at the close of the testimony and before he announced his decision, of requesting and obtaining a physical and psychological evaluation of Anne;

(3) The evidence establishes that without a transplant Stephen will, at the very least, suffer severe and progressive deterioration, and that there are no medically preferable alternatives to a kidney transplant for Stephen;

(4) The dangers of the operation are minimal. Since she is in good health, the risks to Anne are small, and there is evidence that she will not suffer psychological harm;

(5) The evidence establishes that neither long-term dialysis nor a cadaver transplant or transplant from other living donors is medically acceptable;

(6) Stephen will probably benefit substantially from the transplant, and the risk to him from the operation, including long-term risks, are medically acceptable;

(7) The trial court's decision to authorize the operation was made only after a full judicial proceeding in which the interests of Anne were championed by an attorney ad litem, appointed by the court. The attorney ad litem has assumed an adversarial role, asserting the child's interest in not being a donor and vigorously questioning the power of the court to authorize the operation. This is not a case where the attorney ad litem assumed a purely passive role, participating in the hearing merely to rubber-stamp the guardian's decision while giving to the

proceedings the outward appearance of compliance with due process requirements.

Given the presence of all the factors and circumstances outlined above, and limiting our decision to such facts and circumstances, we conclude that the trial court did not exceed its authority by authorizing the participation of Anne in the kidney transplant as a donor, since there is strong evidence to the effect that she will receive substantial psychological benefits from such participation. Nothing in this opinion is to be construed as being applicable to a situation where the proposed donee is not a parent or sibling of the incompetent.

We consider it proper and judicious to suggest that the problem of organ donations by incompetents can be more effectively addressed by the legislature, whose members can promulgate standards based on expert medical, psychiatric and psychological information, as well as testimony and experience of social workers which is not readily available to the judiciary. While we believe that the limited nature of our decision in this case will prevent the exploitation of minors and mental incompetents, we acknowledge that legislators are better qualified to conduct the necessary investigations which will yield a system of rules to adequately protect minors and other incompetents from exploitation without denying them such benefits as competent adults may derive from the organ-donating experience.

The judgment of the trial court is affirmed.