Dr. Dale ALLEN and Dr. J. G. Matthews, Appellants,

v.

David W. ROARK and Wife, Sherry L. Roark, Individually and as Sole Heirs of the Estate of Robert Ryan Roark, Deceased, Appellees.

No. 18503.

Court of Appeals of Texas, Fort Worth.

Nov. 19, 1981.

Rehearing Denied Dec. 17, 1981.

Cantey, Hanger, Gooch, Munn & Collins and Rod Patterson, Richard L. Griffith, Fort Worth, Bailey, Williams, Westfall, Lee & Fowler and James A. Williams, Dallas, for appellants.

John H. Holloway, Houston, for appellees.

Before MASSEY, C. J., and SPURLOCK and HOLMAN, JJ.

## OPINION

HOLMAN, Justice.

This is a medical malpractice case arising from injuries suffered by appellees' son in the process of his birth.

The physicians are appealing from the judgment awarding damages to the child's estate for pain and suffering and medical expenses to the father.

We affirm as to Dr. Allen and reverse and render as to Dr. Matthews.

Appellants are Dr. Allen, the generalist physician engaged by appellees for the delivery, and Dr. Matthews, the obstetrical specialist whose aid he enlisted during the mother's difficult labor.

It was alleged that during the breech delivery, the infant's skull was fractured. Delivery was accomplished by using forceps. The record reflects the child's subsequent death, before the age of one year, from unrelated causes.

As sole survivors and heirs at law of their infant son, appellees sued on behalf of the child's estate alleging that upon the child's birth, appellants knew, or in the exercise of ordinary care should have known, of the skull fractures and negligently failed to (a) inform appellees and (b) refer the child for surgery.

The suit is for damages for the child's physical pain, mental anguish and physical injuries; the mother's physical pain and mental anguish; and reasonable and necessary medical expenses.

In summary, the jury found that (1) the generalist used forceps during the delivery, (2) their use by the specialist was negligent, (3) such negligence proximately caused the fractures, (4) the generalist failed to obtain the appellees' "informed consent" concerning diagnosis and treatment of the injuries, (5) such failure proximately caused injury or damage to the infant, (6) $10,000.00 would have fairly and reasonably compensated him had he lived, (7) $2,000.00 would reasonably compensate the appellant father for hospital and medical expenses, and (8) fifty percent of the negligence was attributable to each appellant.

The jury found no damages for the mother, who did not appear during the trial.

That the skull was fractured during the delivery is not in dispute. It was repaired by surgery five weeks after his birth.

The root of the controversy, from Dr. Allen's standpoint, is the *doctrine of informed consent*, which appears to have its origins in an opinion by Justice Cardozo, *Schloendorff v. Society of New York Hospital*, 211 N.Y. 125, 105 N.E. 92, 93 (1914). The doctrine condemns a physician's failure to obtain a patient's informed consent prior to treatment, as undermining the patient's inherent right to accept or reject a specific medical technique.

In *Salgo v. Leland Stanford, Jr. Univ. Bd. of Trust,* 154 Cal.App.2d 560, 317 P.2d 170 (1957), at 181, it was stated that "A physician violates his duty to his patient and subjects himself to liability if he withholds any facts which are necessary to form basis of an intelligent consent by patient to proposed treatment."

The Texas Supreme Court adopted the doctrine in *Wilson v. Scott,* 412 S.W.2d 299 (1967), at 301:

"Physicians and surgeons have a duty to make a reasonable disclosure to a patient of risks that are incident to medical diagnosis and treatment. This duty is based upon the patient's right to information adequate for him to exercise an informed consent to or refusal of the procedure."

The method of proving that a physician had not performed this duty is at 302:

"We conclude therefore that the plaintiff had the burden to prove by expert medical evidence what a reasonable medical practitioner of the same school and same or similar community under the same or similar circumstances would have disclosed to his patient about the risks incident to a proposed diagnosis or treatment, that the physician departed from that standard, causation and damages."

First we consider the points raised by Dr. Allen. He contends the doctrine of informed consent is inapplicable to the facts of this case. He argues, *inter alia,* that (a) any duty to inform would have been owed only to his patient, the mother, and only prior to childbirth; (b) he owed no such duty to the infant; (c) the appellees introduced no expert testimony to establish that the community medical standards would have required him to disclose the possibility that the infant's skull was fractured; or (d) that Dr. Allen deviated from any such standard.

Special issue no. 8 reads:

"Do you find from a preponderance of the evidence that Dr. Dale Allen failed to obtain the 'informed consent' of the parents of Robert Ryan Roark concerning the possible injury to the infant's head?

"By the term 'INFORMED CONSENT', as used in this issue, is meant the furnishing by the physician to the parents of the infant sufficient information about the nature and extent of possible injuries sustained at his birth and the complications associated with such injuries, together with the information as to available medical or surgical means to diagnose such injuries, and the risks or dangers inherent in connection with such injuries or failure to diagnose such injuries, to permit the parents of the infant to make a knowledgeable and fully informed decision as to accepting or refusing other diagnostic procedures or suggested medical or surgical care or lack of medical or surgical care of fractures of the skull of an infant."

"Answer 'We Do' or 'We do not'

"Answer: We Do"

Dr. Allen asserts that as a prerequisite to special issue no. 8 there must be a finding which establishes an applicable standard of medical care in the community and a deviation therefrom. *Wilson, supra.*

We do not question the law as stated in *Wilson.* However, on the facts of the case at bar, we conclude that failure to obtain informed consent can be proven without finding deviation from the *community's* standard of medical care.

■ Significantly, a defendant physician's own testimony can establish the standard of care applicable to his case. *Wilson, supra; Smith v. Guthrie,* 557 S.W.2d 163 (Tex.Civ.App.—Fort Worth 1977, writ ref'd n. r. e.).

The statement of facts contain the following testimony of Dr. Allen:

Q. Doctor, once more, let me ask you the simple question: Did Mrs. Roark excuse you from her medical and surgical attendance at anytime during her labor?

A. No.

Q. Did you know that she had employed you to deliver this child?

A. Yes.

\*        \*        \*        \*        \*        \*

Q. Wasn't it a fact that you intended to take care of this child after it was born?

A. Yes.

Q. Except for the fact of the complications that occurred at the time of surgery, you are the doctor who would have cleaned the child up, resuscitated it and checked it out? Isn't this true?

A. That is true under normal circumstances.

Q. Well, you had two lives to look at at that stage, the mother and the child. Isn't that correct?

A. That is correct.

   \*    \*    \*    \*    \*    \*

Q. Well, as part of your *contractual duties,* assuming an agreement was entered into by this lady and her husband for you to attend her in delivery and take care of the child, was for you to see to the child after it was born. We agreed on that, didn't we? (Emphasis supplied.)

A. Yes.

Q. What did you do to find out whether this child's skull was fractured after it was born?

A. I didn't do anything. I didn't—Dr. Roig examined the child. I examined the child. The child was normal neurologically, and we had no reason to feel like that there was any brain damage involved.

Q. There was indentions on both sides of the skull, weren't there, that you could see while the patient was in the hospital?

A. Yes, but these are relatively common with the use of forceps even with the head first delivery.

Q. Well, my question is: If you could see the indentions, Doctor, what did you do to find out whether or not the skull was fractured?

A. I did what I do whenever I see indentions. I feel like this is primarily a soft tissue indention and will resolve itself with time.

Q. What other means do you have available, as a reasonable and prudent doctor exercising any degree of care, to find out whether a child's skull has been fractured by forceps, other than by physically examining the patient?

A. Well, if the child has or indications that there is a possibility of a fracture, you can X-ray it.

Q. Was X-ray available there at the hospital?

A. Yes.

Q. Why didn't you X-ray the child?

A. I didn't feel at the time that it was indicated.

Q. But if the child had a fracture of the skull, an X-ray would, in reasonable probability, show it. Is that correct?

A. That is correct.

Q. The fact of the business, a number of weeks later X-rays did, in fact, show the fractures?

A. That is correct.

   \*    \*    \*    \*    \*    \*

Q. Doctor, how many times did you see this child after it was born, and examined its head to find out whether or not this indention, that you are talking about which you thought was tissue swelling, had or hadn't gone away?

A. I saw the baby every day.

Q. Well, did the indention go away?

A. No.

   \*    \*    \*    \*    \*    \*

Q. Would you agree, sir, that in 1976, *under the circumstances,* that the correct medical procedures between doctor and patient would be to advise the parents of the possibility that such a fracture exists in order that the child could be evaluated by a doctor later and proper X-rays made? (Emphasis supplied.)

A. Yes, if the fracture was assumed to be there.

   \*    \*    \*    \*    \*    \*

Q. Doctor, you mean to tell me, as a physician, you could not feel this child's head after three or four days and tell that it was indented so far as the skull was concerned?

A. I'm sure you could tell it.

Q. Did you attempt to feel it to find out?

A. I am sure I probably did.

\*   \*   \*   \*   \*   \*

Having acknowledged both a contract duty to care for the child (SF 268) and, that if the fracture was assumed to exist, then the *correct procedure under the circumstances* would be to advise the parents of the possibility of skull fracture in order to have the child evaluated (SF 273), we believe Dr. Allen's conduct should be measured against his own admission as to the standard of care contractually assumed by him.

The credibility of the witness, as to whether he did or did not recognize the possibility that the infant was injured, was for the jury to evaluate. *Leyva v. Pacheco*, 163 Tex. 638, 358 S.W.2d 547 (1962).

Dr. Allen's testimony established the standard of care applicable to him on the facts of this case. The jury's answer to special issue no. 8 is a finding that he deviated from that standard.

Dr. Allen argues that there either was no evidence or insufficient evidence to support the jury's answer to issue no. 8. Contentions of no evidence require that we consider only the evidence supporting the jury's findings; and that we disregard all contrary evidence. *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400 (Tex.1981); *Butler v. Hanson*, 455 S.W.2d 942 (Tex. 1970). We find there was evidence to support the jury's answer to issue no. 8.

Dr. Allen's first four points of error are overruled.

His fifth point urges both no evidence and insufficient evidence that his failure to obtain informed consent was a proximate cause of any damage to the appellees.

Part of appellees' cause of action, on behalf of the child's estate, sought damages for the child's pain and anguish. In this capacity, appellees' status was that of *next friend* of the child. Any competent adult may sue in that capacity, for the child's best interests. Tex.R.Civ.P. 44; *Gordy v. Alexander*, 550 S.W.2d 146 (Tex.Civ.App.—Amarillo 1977, writ ref'd n. r. e.).

The real party plaintiff in a suit by next friend is the child. *McGinnis v. McGinnis*, 267 S.W.2d 432 (Tex.Civ.App.—San Antonio 1954, no writ). The appellants did not object in trial court to the appellees' capacity to sue on behalf of their child's estate, and the question may not be raised for the first time on appeal. Tex.R.Civ.P. 93; *Sam Kane Beef Processors, Inc. v. Manning*, 601 S.W.2d 93 (Tex.Civ.App.—Corpus Christi 1980, no writ).

Appropriately then the question is not whether Dr. Allen's conduct may have injured the appellees, but whether it injured the child on whose behalf the suit was brought.

Dr. Allen's testimony established that his responsibility of medical care extended beyond the mother to the child. Since the newborn infant would have been incapable of evaluating information about his medical condition or consenting to further diagnosis or treatment, the privilege and right to receive and act upon that information belongs to the infant's parents. Tex. Family Code Ann. § 12.04(6) (1975); *Little v. Little*, 576 S.W.2d 493 (Tex.Civ.App.—San Antonio 1979, no writ).

Neurological damage to the child was neither pled nor proved. There was allegation and proof that the diagnosis and treatment of the fractures was delayed for five weeks after his birth, when the parents lacked information as to the extent of injury. The father, David Roark, testified as to his observation of the infant's apparent pain and anguish. He also testified that if he and the mother had been informed sooner as to the extent of injury, they would have had the injuries X-rayed and treated by specialists. Neurosurgeon Morris Sanders testi-

fied that infants can suffer pain just as an adult does; and that after surgical repair, the child would have no conscious recollection of the pain.

■ The courts of this state have held that the existence of physical pain and suffering may be *presumed* in cases where it is a natural consequence of an injury, such as a fractured skull. The law does not require direct proof or specific findings on matters of universal knowledge. *City of Austin v. Selter*, 415 S.W.2d 489 (Tex.Civ.App.—Austin 1969, writ ref'd n. r. e.); *Qualls v. Miller*, 414 S.W.2d 746 (Tex.Civ.App.—Texarkana 1967, writ dism'd); *English v. Hegi*, 337 S.W.2d 860 (Tex.Civ.App.—Amarillo 1960, no writ).

■ Having considered all of the evidence, we find that it was sufficient for the jury to conclude that Dr. Allen did not advise the parents that the infant's skull indentions might be fractures; and that the infant did suffer pain and anguish while the injury went untreated.

Dr. Allen's fifth point of error is overruled.

His sixth point is that there is no evidence that the appellees sustained $10,-000.00 in damages. The amount awarded by the jury, however, was awarded to the child, not to the appellees.

The courts have recognized the inherent difficulty in appraising another's pain and suffering, but that is the jury's function. *Bill Hendrix Auto Parts v. Blackburn*, 433 S.W.2d 237 (Tex.Civ.App.—Houston [14th Dist.] 1968, no writ).

■ The amount of damages suffered is a fact issue for the jury, not for this court. Indeed, it is our duty to view the evidence and its inferences in the light that is most favorable to the jury's award. We will not disturb the award, unless it is so irrational or excessive as to shock the conscience of the court. *Bill Hendrix, supra.*

Dr. Allen's sixth point of error is overruled.

His seventh, eighth and ninth points of error complain of the trial court's defini-

tions of the terms "proximate cause" and "ordinary care," and the failure to define "physician," asserting that the court's instructions failed to distinguish between his status as a generalist and that of Dr. Matthews, the specialist.

■ We hold that the instructions given did properly distinguish between the general practitioner and the obstetrician. Dr. Allen's seventh, eighth and ninth points are overruled.

His tenth and final point asserts error in the trial court's failure to submit an instruction which delineates the duty of a physician in Dr. Allen's position toward his patient.

■ We conclude, however, that in light of Dr. Allen's own testimony as to his contractual duty the trial court's definitions adequately and properly instructed the jury. His tenth point of error is overruled.

Dr. Morris Sanders, the neurosurgeon who repaired the infant's fractures, testified that, as a medical probability, the injuries were caused by the forceps delivery.

The statement of facts also contains the following testimony of the appellant, Dr. Matthews:

Q. So actually, you delivered the head by a manual maneuver without the forceps.

A. Right.

Q. But you put the forceps in on two occasions to pull the head to try to extract it?

A. Right.

Q. Is it possible that the fracture occurred with the second application?

A. No.

Q. *Was there some question in your mind* when this child was delivered *of the possibility of a fracture* of the skull with the forceps?

A. *Immediately there was, yes.* (Emphasis supplied.)

Q. What did you do to find out?

A. I spoke to Dr. Roig about the details and the circumstances of the deliv-

ery. The baby's response was such, he informed me, that no neurologic signs, no clinical signs, no other signs were evident and he didn't feel that there was any.

Q. Well, did you look at the child?

A. Yes, I did. Certainly did.

Q. Were the fractures there?

A. How could I tell they were there?

Q. I don't know. You are the doctor—

A. The only way—

Q. —not me.

A. The only way those fractures could be determined were by X-ray, as you saw, and it would have taken a radiologist to determine that fracture, not an average physician.

Q. You are not an average physician, are you?

A. I am speaking of a non-radiologist.

Q. My question, sir, is: You have full knowledge of the possibility of fracturing the child's skull—

A. Not the probability, no.

Q. Possibility?

A. Possibility.

Q. Do you release the child in the custody of the parents without telling them the possibility—

A. I had nothing to do with the release of the child.

Q. Did you tell Dr. Allen that there is a possibility that you fractured the child's skull?

A. I think we discussed the possibility of the slippage of the forceps afterwards.

Q. Did you assume that Dr. Allen would tell the parents about this incident?

A. I didn't discuss it any further than the initial period of time following the delivery when Dr. Roig was there, Dr. Allen was there. I can't remember our exact conversation at all, but they knew the difficulty that was encountered.

The findings of negligence and proximate cause by Dr. Matthews are in special issues nos. 2 and 3:

## SPECIAL ISSUE NO. 2

If you have answered "Yes" to Special Issue No. 1, and only in such event, then answer subdivision B. of this special issue.

Do you find from a preponderance of the evidence that in the use of forceps or other surgical instruments there was negligence on the part of:

ANSWER "YES" OR "NO"

A. Dr. Dale Allen? NO

B. Dr. J. G. Matthews? YES

## SPECIAL ISSUE NO. 3

If you have answered either subdivision of Special Issue No. 2 "Yes," then answer the corresponding subdivision of this special issue.

Do you find from a preponderance of the evidence that fractures to the skull of Robert Ryan Roark were proximately caused by such negligence on the part of:

ANSWER "YES" OR "NO"

A. Dr. Dale Allen? NO

B. Dr. J. G. Matthews? YES

In his second point of error, Dr. Matthews asserts that there are no proper pleadings upon which to predicate the submission of issue no. 2 to the jury. We agree.

In his fourth point of error, Dr. Matthews asserts that there are no proper pleadings upon which to predicate the submission of issue no. 3 to the jury. We agree.

The case was tried on plaintiff's original petition, which contains no allegation that Dr. Matthews' use of forceps in the childbirth was negligent; that they were used in a negligent manner; or that a negligent use of forceps was a proximate cause of the child's injury.

Having reviewed the statement of facts, we conclude that appellant Matthews timely objected to testimony that would support special issues 2 and 3; and that he maintained a running objection thereto; and that the trial court acknowledged that the issue of Dr. Matthews' negligence was not tried by consent.

We sustain Dr. Matthews' second and fourth points of error and therefore do not reach his other points.

In a cross-point, appellees contend that the trial court abused its discretion in denying appellees the privilege of amending their petition, after the close of evidence, to include allegations that would support special issues 1 and 2.

We find no abuse of discretion and will not disturb the trial court's refusal of the appellees' amendment. *Schrader v. Artco Bell Corp.*, 579 S.W.2d 534 (Tex.Civ. App.—Tyler 1979, writ ref'd n. r. e.); *Fry v. Guillote*, 577 S.W.2d 346 (Tex.Civ.App.— Houston [14th Dist.] 1979, writ ref'd n. r. e.). Appellees' cross-point is overruled.

The judgment as to appellant Dr. Allen is affirmed. The judgment as to appellant Dr. Matthews is reversed, and judgment is rendered providing that plaintiff, appellees, David W. Roark, et al., recover nothing against Dr. J. G. Matthews.