Carla HARDEMAN and C.J.
Hardeman, Appellants,

v.

Nita Gay JUDGE, Guardian of the
Person and Estate of Lena Mae
Hardeman, Appellee.

No. 2–95–170–CV.

Court of Appeals of Texas,
Fort Worth.

Oct. 3, 1996.

Rehearing Overruled Nov. 7, 1996.

Ronnie Phillips, Denton, for appellants.

Richard H. Kelsey and John E. Kelsey, Denton, for appellee.

Before LIVINGSTON, DAUPHINOT and BRIGHAM, JJ.

## OPINION

LIVINGSTON, Justice.

In 1992, Appellee Nita Gay Judge was appointed permanent Guardian of the person and estate of her mother, Lena Mae Hardeman. Lena had been living in her home on the family farm in Denton County until she was removed from the property by Adult Protective Services Workers.

Lena, then in her late eighties, had numerous health problems and could not continue living alone. She has been a resident of a nursing home since the time she was declared non compos mentis. In 1995, the Guardian requested permission to sell the 200 acre farm. That request and the subsequent order approving the sale were strongly opposed by C.J. Hardeman and his daughter Carla Hardeman, Lena's son and granddaughter, respectively. In three points of error, Appellants contend the trial court violated the Texas Constitution, failed to comply with Probate Code requirements, and failed to segregate Lena's single person homestead before authorizing a sale of the remaining acres. Finding that the Guardian had the power to sell the land to provide funds for Lena's care and support, and that any irregularities in the sale process did not constitute reversible error, we overrule the points of error and affirm the trial court's judgment.

### FACTS

The farm was the homestead of Sam and Lena Hardeman. Sam died years ago and Lena continued to live on the farm until she was forcibly removed in 1992. The land was used mainly for ranching purposes. Neither side contests the fact that Lena is not capable of living alone and indeed is incompetent to form any intent to either abandon her homestead, or to declare another location to be her homestead. Although the trial court heard evidence on the issue of whether Lena ever intended to sell the farm, that issue was complicated by the existence of two conflicting wills executed by Lena. A 1982 will divided her estate fairly evenly among her children and grandchildren, while a 1988 will left all of her property to C.J., with a residuary clause naming Carla.

The Guardian was able to rent the house to a tenant after several family members donated the labor to make it habitable. That rental income, along with rental income from the lease of the farm as pasturage, and a small amount of Social Security, was insufficient to pay the medical and living expenses of Lena in the nursing home. Those expenses total in excess of $30,000 per year. In 1992, the Guardian petitioned the court for authority to sell the farm to pay Lena's bills. C.J. and Carla opposed the sale of the property, but were unable to come up with funding for an alternative that would meet Lena's financial needs.

As an alternative to selling the property, the trial court approved the Guardian's suggestion of a three-year loan from the Justin State Bank in the amount of $150,000 secured by a lien on the property. The Guardian only withdrew money as needed in $25,000 increments. As of June 1995, Lena's estate owed the bank some $82,000. The note was due to mature in October of 1995. A bank officer testified that he could not assure the court that the bank would extend the note for the additional two years requested by Appellants, but that the bank had not yet refused an extension either.

It is apparent from the record before us that the parties believed in 1992 that the three-year loan would be sufficient to meet Lena's financial needs mainly because no one believed Lena would live for three more years. The testimony in the 1995 hearings was that Lena was "declining" but was a strong woman and no one would testify that her death was imminent. Faced with a need for more funds for an uncertain amount of time, the Guardian re-urged her request to sell the land in 1995, this time with a willing buyer. The Guardian presented testimony from a buyer willing to pay $700,000 cash for the entire property in connection with the development of a racetrack near Justin, Texas. The trial court subsequently approved the sale of the land.

### DISCUSSION

█ In point of error one, Appellants contend the trial court erred in authorizing the sale of the property by the Guardian because

it violated the Texas Constitution and was beyond the power and authority of the Guardian. *See* TEX. CONST. art. XVI, § 50. This multifarious point of error questions both whether a guardian may sell a homestead if that express power is not found in the Probate Code, and whether a guardian may undertake a forced sale of a homestead to pay debts of the ward.

The rights, powers, and duties of guardians of the estate and person are now governed by Chapter XIII of the Probate Code. TEX. PROB. CODE ANN. §§ 601–889 (Vernon Supp.1996). A guardian of the estate is required to take care of and manage the estate of the ward in the same way a prudent person would handle their own affairs. *Id.* § 768. The guardian is expressly authorized to expend funds as necessary to care for and maintain the ward. *Id.* § 770(a). A guardian may borrow money and mortgage "any real or personal property of a guardianship estate" when necessary to pay the ward's debts. *Id.* § 781(a)(3). Subpart H of Chapter XIII covers sales of a ward's property. *Id.* §§ 811–837. Appellants are correct that the Probate Code does not expressly state that a guardian may sell the homestead property of a ward, and argue that if such were the case, the guardian of the estate of a ward could elect to sell the homestead over the objection of the guardian of the person of the ward who may be living on the property. Texas case law holds that the guardian of the estate may indeed seek the partition of homestead property, but may not oust the guardian of the person and the minors who are living on the property. *Hudgins v. Sansom,* 72 Tex. 229, 10 S.W. 104, 106 (1888). In *Hudgins,* the minors inherited the right to occupy the property, although not the ownership of the property, and the court held that right would be protected during their minority. *Id.* We are not prepared, however, to hold that a guardian is always empowered to sell or encumber a ward's homestead property and such a holding is not required by the case before us.

Appellants argue that a guardian may not exercise any right not expressly given in the code, citing *Frazier v. Levi,* 440 S.W.2d 393, 395 (Tex.Civ.App.—Houston [1st Dist.] 1969,

no writ). *Frazier,* a factually unique and pre-code case, held that a guardian could not receive permission from the probate court to have the ward—a sexually promiscuous woman with the I.Q. of a six-year-old child who already had two mentally handicapped children—sterilized to prevent the birth of any more children. *Frazier,* 440 S.W.2d at 394. The court held that neither the statutes nor the Texas Constitution gave the court such power over a ward, noting there was no medical reason for the surgery. *Id.* The Probate Code now expressly imposes upon the guardian of the person of a ward the duty "to provide the ward with clothing, food, medical care, and shelter; and ... to consent to medical, psychiatric, and surgical treatment." TEX. PROB. CODE ANN. § 767(3)(4) (Vernon Supp.1996). *Frazier* should be limited to its facts and should not be read to hold that a guardian may not do *any* act, no matter how beneficial to the ward, unless that act is specifically authorized in the Probate Code.

One Texas court has ruled that a guardian could seek approval for a mentally retarded girl to donate a kidney to her brother—an act certainly not specified in the code. *Little v. Little,* 576 S.W.2d 493, 500 (Tex.Civ.App.— San Antonio 1979, no writ). The San Antonio Court pointed out that "[t]here is no Texas case holding that an action by a guardian is unauthorized where the ward, if competent, would so act, and such action would result in benefits to the ward which he would enjoy during his lifetime." *Id.* at 498. A guardian may undertake that class of activities that the code outlines in providing for the care and needs of the ward. We find nothing in the Probate Code that would clearly show that homestead property is excluded from the property of a ward that a guardian may, with court approval, sell.

■ If, however, a guardian cannot or does not elect to sell the homestead, Appellants assert this is an illegal "forced sale." The protection of a homestead from forced sale is such an integral part of Texas history and law as to need no citation of authority. However, the facts of this case do not reveal a "forced sale" has occurred for several reasons.

■ If the guardian has the power to voluntarily sell the homestead, the issue of forced sale does not arise and Appellants' cases stating that forced sales are void are inapplicable. A property owner, of course, may always elect to sell their property to pay debts, even though the debt could not have been enforced against the homestead property. *Ketcham v. First Nat'l Bank of New Boston, Texas,* 875 S.W.2d 753, 756 (Tex. App.—Texarkana 1994, no writ).

It is also clear to this court that if this property no longer has the homestead status, there can be no forced sale. Another appellate court has held a guardian may formulate the intent to establish a homestead for a ward who is incapable of intent. It would follow, therefore, that a guardian may also abandon or relinquish the homestead status of property on behalf of an incompetent ward. *See State, By & Through Texas Dept. of Mental Health & Mental Retardation v. Ellison,* 914 S.W.2d 679, 684 (Tex.App.—Austin 1996, no writ) (guardian of estate of institutionalized ward with an I.Q. of 17 could declare 100 acres of larger rural estate was ward's homestead, thus State could not sell all of property to pay for ward's care).

Whether the Guardian "decided" the farm was no longer Lena's homestead, or whether the Guardian simply decided to sell Lena's homestead, the result is the same. The Guardian had the power to sell this piece of property to provide funds for the needs of the Ward, even if it damaged or extinguished the inheritance rights of the Appellants or other persons who stood to inherit the property under either of the wills. As the trial judge stated to the parties:

> The Court has placed the needs of the ward above the interests of the beneficiaries. And I note and conclude and find that the actions of the Court today may very well be in the direct—to the direct advantage, to the direct, substantial, significant advantage of one of the litigants in a potential will contest and to the great disadvantage of others and that I've taken that into consideration; that I believe the guardian has taken it into consideration; that the interests of the beneficiaries of the estate cannot control; that while the finan-

cial impact of this decision to the interest of the beneficiaries may at a future date be monumental and may, in fact, cause every legal heir at law and every beneficiary of Lena Mae Hardeman except one to suffer a complete loss, the needs of the ward control over that.

The trial judge was correct in his statement of the paramount duty of the Guardian and the court to the welfare of the Ward. And as the judge further stated, "it is impossible for me to accept the theory that [the] ward's asset has to remain locked in the shackles of a homestead that is no longer a meaningful element of the title and no longer has any meaning whatsoever to the incapacitated ward." This is not an instance where a guardian has "waived" some right of the ward without obtaining value in return. The Guardian sold the farm, a piece of property once no doubt dear to the Ward but now a means of obtaining the money to provide expensive care for a ward now incapable of caring for herself.

■ Further, the term "forced sale" implies a "taking" of property under some judicial, statutory, or contractual right, usually under a power of sale or enforcement of lien. That had not yet happened although the prospect may have been imminent. Additionally, if the allegedly invalid "waiver" of a homestead right occurred, it occurred when the non-purchase money, non-improvement lien was placed upon the property in 1992; an issue not appealed by Appellants. Thus, under these facts, there was no "forced sale." On this specific issue, we hold that a guardian who may assert homestead rights on behalf of a ward may likewise abandon those rights when it is in the interests of the ward to do so. Point of error one is overruled.

In point of error three, Appellants contend the court erred in allowing the sale of all of the property without first segregating at least a single person's 100 acre rural homestead for the ward. The cases cited by Appellants concern steps a court must take when authorizing a "forced sale" of a homestead. We have held in point of error one that a "forced sale" did not occur in this case. Point of error three is overruled.

In point of error two, Appellants assert that the court erred in confirming the sale because "mandatory requirements of the Probate Code § 820 through § 826 were abrogated by Guardian Appellee and not followed by the trial court." Our review of the record reveals that Appellant never raised section 821 at the hearings below, and we will not address that section on appeal. *See* TEX. R.APP. P. 52(a); *see also* TEX.R. CIV. EVID. 103(a)(1). If a party fails to object and bring error to a trial court's attention, error is not preserved, and the complaint is waived. *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex.1991) (op. on reh'g). However, error is not waived if it falls within the narrow category of "fundamental error" which requires no trial court predicate for appellate review. *See Cox v. Johnson*, 638 S.W.2d 867, 868 (Tex.1982). Appellants have given us no authority that failure to comply with some requirement of the Probate Code amounts to fundamental error and we decline to so hold.

Appellants' complaints as to the many ways in which the Guardian or court failed to comply with the Probate Code sections regulating the sale of real property are vague and inconsistent. The complaints center around defects in the report of sale, whereas the cases cited by Appellants point out that it is vital that the record contain an "Order of Sale." *See, e.g.* TEX. PROB. CODE ANN. § 825 (Vernon Supp.1996); *Walker v. Sharpe*, 807 S.W.2d 448, 451 (Tex.App.—Corpus Christi 1991, writ denied). The record before us plainly contains an Order of Sale, dated June 14, 1995, thus Appellants' authorities are not applicable to cause a reversal of the trial court's judgment. Indeed, the *Walker* case itself states that irregularities in the sale process do not necessarily render the transaction void:

> However, the probate court is not required to set aside an order of sale after it becomes final, because of irregularities or failures to strictly comply with the provisions of the Probate Code applicable to the sale of property belonging to the decedent's estate. See *Carson v. Estate of Carson*, 601 S.W.2d 171, 174 (Tex.Civ. App.—Corpus Christi 1980, writ ref'd n.r.e.); 29 Tex. Jur.3d Decedents' Estates Sec. 552 (1983). In addition, confirmation

of a sale cures defects, mistakes, errors and irregularities in proceedings where the court had jurisdiction, and the sale is not subject to collateral attack. *Goolsby v. Bush*, 172 S.W.2d 758, 762 (Tex.Civ.App.— El Paso 1943, no writ). In the present case, however, the lack of an order of sale is more than merely an irregularity in the procedure; there is no statutory authority for the probate court to issue an order of confirmation without a prior order of sale.

*Walker*, 807 S.W.2d at 450. Although Appellants contend the sale was "void" they do not explain how any irregularities caused the transaction to be other than voidable. The parties were properly before the probate court, and the court had jurisdiction over the property that was part of the Ward's estate. *See Easterline v. Bean*, 121 Tex. 327, 329, 49 S.W.2d 427, 429 (1932).

The record is also clear that Appellants received due process and notice of all proceedings. The trial court ordered a hearing held on the application to sell property, with proper notice to all interested parties. There is no claim that Appellants were denied an opportunity to present and argue their opposition to the sale of the farm. Their opposition is on file in the transcript, and the statement of facts from three hearings shows the full and active participation of Appellants. The order confirming sale after the third hearing clearly shows the court knew what property was being sold, the terms of the sale, the identity of the buyer, the amount of the private sale, that the buyer was ready, willing, and able to close the sale, and that the transaction was being done in the best interest of the Ward. We also note that the Probate Code contains a "Penalty for Neglect" if the guardian of an estate fails to deliver a deed or otherwise fails to comply with section 836 in selling a ward's property. TEX. PROB. CODE ANN. § 837 (Vernon Supp. 1996). No other penalty was provided by the legislature in the Probate Code for failure to strictly comply with the code's requirements.

We hold that whatever defects of form or procedure may have occurred in this case were minor irregularities, and certainly not such as would void the sale. *See San Anto-*

*nio Sav. Ass'n v. Palmer,* 780 S.W.2d 803 (Tex.App.—San Antonio 1989, writ denied). Point of error two is overruled.

The judgment of the trial court is affirmed.